Filed 10/7/15  P. v. Montecastro CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

|  |  |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>v.<br><br>HENDRIX MORENO MONTECASTRO et al.,<br><br>　　　Defendants and Appellants. | E060533<br><br>(Super.Ct.No. RIF153306)<br><br>OPINION |

APPEAL from the Superior Court of Riverside County.  Jeffrey Prevost, Judge.

Affirmed as modified.

Nancy Olsen, under appointment by the Court of Appeal, for Defendant and Appellant Hendrix Moreno Montecastro.

Donna L. Harris for Defendant and Appellant Helen Moreno Pedrino.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, and Barry Carlton and Adrianne S. Denault, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Hendrix Moreno Montecastro (along with a partner) headed up a Ponzi scheme that stole approximately $30 million from would-be investors. Montecastro's mother, Helen Moreno Pedrino, was the partnership's top salesperson.

Montecastro was charged with 317 counts involving 29 victims[1] and found guilty on 304 counts involving 27 victims. He was sentenced to a total of 81 years 8 months in prison.

Pedrino was charged with 41 counts involving five victims. She was found guilty as charged and sentenced to a total of seven years in prison.

Both defendants brought *Faretta* motions,[2] which the trial court granted. They contend, however, that the trial court erred by denying their subsequent motions during trial to reappoint counsel or to appoint advisory counsel. They also contend that the trial court erred at sentencing in calculating direct victim restitution and by ordering them not to own or possess a firearm, a deadly weapon, or ammunition.

In addition, Montecastro contends that certain counts were not supported by substantial evidence, that his confrontation rights were violated on the counts involving victim Derek Nolde because Nolde did not testify at trial, that his sentence constitutes cruel and unusual punishment, and that his abstract of judgment is erroneous.

---

[1] If two victims invested together, the information named them as victims of a single count — e.g., Leonila and Ron Elsman. For simplicity, we refer to each such pair as a singular "victim."

[2] A *Faretta* motion is a motion to allow a defendant to represent him or herself. (*Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).)

Finally, Pedrino contends that the trial court gave erroneous aiding and abetting instructions.

We agree that there was insufficient evidence of the sale of or an offer to sell a "commodity" to support seven particular commodity fraud counts against Montecastro. Otherwise, we find no reversible error affecting the convictions.

We also agree that (1) the amount of direct victim restitution must be corrected, and (2) the trial court erred by ordering defendants not to own or possess a firearm, a deadly weapon, or ammunition. Otherwise, we find no error affecting the sentences. Accordingly, we will modify the judgment and affirm the judgment as modified. No remand is necessary.

# I

## FACTUAL BACKGROUND[3]

A. *The Structure of the Partnership*.

James Duncan testified as a witness for the prosecution. Originally, he had been charged as a codefendant in this case, but he had pleaded guilty to seven felony counts. He had also pleaded guilty in federal court to one count of tax evasion.

---

[3] The parties have not included any exhibits in the clerk's transcript (other than transcripts of recordings that were played for the jury, see Cal. Rules of Court, rule 8.320(b)(11)) and have not asked to have any exhibits transmitted to us. We were not ungrateful for being spared the necessity of reviewing the hundreds and hundreds of exhibits that were admitted. At the same time, however, we questioned how we could review any issue that turns on the evidence when we do not have all of the evidence before us.

Our question was answered by California Rules of Court, rule 8.163 (rule 8.163), which provides, "The reviewing court will presume that the record in an appeal includes all matters material to deciding the issues raised."

"It is, of course, appellant's burden on appeal to present an adequate record for review and affirmatively to demonstrate error. [Citation.]" (*People v. Carter* (2010) 182 Cal.App.4th 522, 531, fn. 6.) Sometimes, it is clear that a material item has been omitted and therefore that the presumption of rule 8.163 has been rebutted. In that event, any issue to which the omitted item is material must be resolved against the appellant.

In this case, however, while it might have been helpful to have at least a judicious selection of the exhibits, we cannot say, based on the record that has been provided to us, that any of the exhibits are material. Hence, the presumption remains controlling.

According to Duncan, he and Montecastro were business partners; they co-owned a company called Stonewood Consulting (Stonewood).[4]  He and Montecastro met every day, and each of them knew what the other one was doing.

Duncan testified that Pedrino was "there from the beginning . . . ."  Originally, she was "the only person . . . that went out and found clients."  "[S]he was a marketing machine."  She was likeable and believable and she had "a wide circle of friends."  As her client base grew, she got her clients to refer their friends.  She was paid referral fees out of the investments made by the clients whom she recruited.

In January 2006, Duncan and Montecastro created Pacific Wealth Management LLC (Pacific) to act as the partnership's "marketing arm."  Pacific used the same name and license number as an unrelated company based in San Diego.  The partners put Maurice McLeod in charge of Pacific.[5]

When Pacific was formed, Pedrino was upset because she felt "undermin[ed]."  To appease her, Duncan and Montecastro created Golden Wealth Management (Golden), which acted as a second marketing arm, parallel to Pacific, under Pedrino's direction.  Nevertheless, Pedrino's clients were told that they were dealing with Stonewood and/or Pacific.

---

[4]     A third person — Anthony Contreras — was a silent partner, not active in the day-to-day management of the business.

[5]     McLeod was related to Montecastro by marriage.

5

Duncan referred to the overall partnership as "Stonewood slash Pacific Wealth." At one seminar (see part I.C, *post*), he told attendees, in Montecastro's presence, that he and Montecastro were partners in both Stonewood and Pacific. Pedrino similarly told prospective clients that Stonewood and Pacific were "going to combine." One client was "confused" as to whether she was dealing with Stonewood or Pacific. Another testified, "Pacific or Stonewood. It's all the same."

McLeod, too, acted as a witness for the prosecution. He had been charged as a codefendant in this case, but he had pleaded guilty to six counts of real estate fraud and securities violations.

McLeod testified that an organizational chart of the partnership, prepared by the prosecution, was accurate. It showed Duncan and Montecastro as the partners in Stonewood. Immediately beneath them were McLeod, as head of Pacific, and Pedrino, as head of Golden. Thus, McLeod testified, he "worked for" Duncan and Montecastro and he worked "with" Pedrino. Lower-level sales, customer service, and administrative personnel of the partnership included Cindi Kelly, Thuan Du, Charlie Choi, Connie Duron, and Christopher Mosqueda.

Cindi Kelly was another witness for the prosecution. She had been charged as a codefendant in this case, but she had pleaded guilty to two felony counts. Duncan and Montecastro had hired her to recruit new clients, in exchange for referral fees based on a percentage of the clients' investments. Later, Montecastro put her in charge of Ocean Ridge Equity, which arranged mortgage loans for the partnership's clients.

6

Kelly claimed that she was unaware of any fraudulent scheme. She testified that she invested in the partnership herself, and, at least at first, she received the promised returns.

Kelly testified that Duncan and Montecastro were partners and that Montecastro "ran" Stonewood. Similarly, she had told one client that Duncan and Montecastro were "in charge of this investment opportunity[.]" She told another client that "the owners" were Duncan and Montecastro. She told still other clients that Duncan and Montecastro were "the bosses of Pacific" and that Montecastro was "her boss."

Kelly got all of her information about available investments from Duncan and Montecastro. They told her the investments were all "guaranteed" and "asset backed." They also gave her all the information about where clients should wire money.

Thuan Du told one client that Duncan and Montecastro were the "heads of the group." He told another that he "was working for" Duncan and Montecastro. He told others that Duncan and Montecastro were "in charge" of the partnership.

Choi told a client he "was working for" Duncan, Montecastro, and McLeod. Duron told a client that she worked for Montecastro. Mosqueda told a client that Duncan, Montecastro, and Pedrino were the "leaders" who were "really responsible for this."

A business plan for Stonewood and Pacific was found in Montecastro's home; it referred to Duncan and Montecastro as "we," "us," and "our," "more than 100 times."

B.    *The "Investments" Offered by the Partnership.*

1.    *Core clients.*

The partnership had "core clients" and "transactional clients."

To become a core client, an investor had to commit to: (1) remain invested for three years, (2) give the partnership total control over his or her finances, and (3) ask no questions — a core client had to trust the partnership "100 percent." In return, core clients supposedly received "special benefits." Some core clients were told that they would become millionaires in three years. Others were told that in five years, they would be able to pay off their homes and have a million dollars left over.

a.    *Core clients must refinance their homes.*

The partnership directed core clients to refinance their homes and to invest the proceeds. They were told that the partnership would pay the difference between their mortgage payments before and after the refinancing. The partnership applied for the refinancing on the clients' behalf; all they had to do was sign. Sometimes the loan applications included falsified earnings and asset information.[6]

The partnership was not very specific about how the money would be invested. One client was told that it would be used to purchase "real estate, foreign currency, precious metals, that type of thing." Pedrino told another that it would be invested in

---

**6**    As an investigating officer testified, the prosecution considered charging mortgage fraud, but decided to focus on securities violations and grand theft to keep the case from getting too complicated.

properties, the "Chicago Mercantile," "medical device[s]," "medical buildings," and "Iraqi dinars."

The partnership had either formed or acquired a number of "dummy companies," including Jovane Investments, Coast Wealth Management, Ridgeline Investments, Sunburst Financial, Palm Valley Advisors, and Total Return Fund. They all shared a single office, albeit with separate telephone lines. At the direction of Duncan and Montecastro, the dummy companies helped clients qualify for loans by falsely verifying their income and their assets. Duncan testified that Montecastro knew what the dummy companies were doing.

b. *Core clients must obtain credit cards.*

The partnership also directed core clients to apply for credit cards and to "pull the total limit out of the credit card and send it to them for investment." One client was told "to take out as much as [you] could, and even when the bank tells you to stop, you talk to the bank manager . . . and you pull the max . . . ." In some instances, the partnership would use the financial control that core clients had given it to apply for the credit cards on their behalf. Thus, some clients received multiple credit cards in the mail, out of the blue.

At first, as with the mortgage payments, clients were told that the partnership would make the monthly payments on the credit cards. Later, however, they were told to hold back part of the proceeds of the credit cards and to use it to make the payments.

Clients were promised high guaranteed returns. One was promised a 300 percent return. Another was promised an 800 percent return in three months. Again, however, the partnership was not very specific about how the money would be invested. Some clients were told that it would be "pool[ed]" with their original investment. Another was told that it would go into either a "real estate opportunity" or a "foreign currency opportunity."

      c.    *Core clients must invest their savings.*

The partnership asked core clients to invest any savings they had, even if it was only $5,000 or $10,000, to invest any money in their retirement accounts, and even to liquidate any stamp collection and to invest the proceeds.

      d.    *Core clients must invest in Iraqi dinars.*

At one point, the partnership had a problem — it could not account to clients for some $19 million of the money that they had invested. Duncan came up with a plan to offer an investment in Iraqi dinars. At the time, the dinar was not traded on any international exchange and did not have any established exchange rate. The partnership bought dinars for less than $400,000, then "allocated" them to clients' accounts as if they were worth $19 million. Some core clients received a shipment of dinars in the mail, unexpectedly and with no explanation.

      2.    *Transactional clients.*

Unlike core clients, transactional clients invested in just one transaction at a time. Some were told that their money would be used to buy and sell distressed properties.

Others were told it would be used to make short-term loans. One was told it would be invested in "real estate, medical centers, gold mining, spas."

They were offered high "guaranteed" returns. Montecastro personally emailed one client, offering a 10 percent return in 60 days. Some were offered 10 percent in 90 days. One was offered 18 percent in 90 days. And, as with one core client, some were offered an 800 percent return within six months.

A few transactional clients (particularly early in the scheme) did actually receive the promised return on their investment; unfortunately, this only emboldened them to invest again, in even larger amounts. One client was told that he had a return on his investment; however, he never actually received the money, because he agreed to roll it over into a new investment.

C.     *The Partnership's Sales Pitch.*

Montecastro taught McLeod how to find new core clients. He told him to market to "a family member, a friend, someone you know from church" and to "leverage the trust . . . ." Montecastro added that he, Pedrino, and McLeod could take advantage of their contacts among Filipinos, nurses, the military and Christians.[7]

In January 2006, the partnership started holding "investment seminars" to recruit new core clients. Existing core clients were invited to the seminars and were encouraged to "bring in [their] friends and family members . . . ." They would be "strategically

---

[7]     Duncan, Montecastro, and Thuan Du were all interested in martial arts. Thus, Du also recruited among martial arts students.

11

placed at different tables" so they could answer questions and stand up and give testimonials. Existing transactional clients were also invited to seminars, where they were encouraged to become core clients.

Duncan and Montecastro spoke at some of the seminars. McLeod held some seminars on his own, but only after Duncan and Montecastro had "coached [him] on what to say." Pedrino arranged one seminar at the Pechanga Casino for her core clients. Pedrino also held seminars at a Marie Callender's restaurant in Temecula.

Transcripts of two of the seminars, at which both Duncan and Montecastro spoke, were introduced into evidence. At these seminars, they claimed to be part of a "network" of sophisticated investors, which allowed them "to find ways to develop capital and to create wealth . . . ." Montecastro claimed, "[L]ast week, . . . we were invited to become . . . a partner with one of the seven members who . . . started with Bill Gates to open up Microsoft."

They claimed to offer investments in real estate, foreign currencies, commodities, gold coins, and rare stamps. Through the network, they claimed, they had a contact who would sell them diamonds for $4,000 each that they could then sell for $7,000 each. They had an opportunity to buy condominiums for $7,500 down at a discount of 17 to 20 percent off the market price. Duncan added, "We have a division that basically buys vintage cars at a discount and resells them . . . ."

Existing clients were asked to recruit their friends, their relatives, and members of organizations to which they belonged. Some clients became "referral partners." This

meant that they recruited new clients in exchange for a percentage of those new clients' investment.

Virgelia ("Virly") Carlson testified that, based on several sales presentations by Pedrino, she refinanced her home and invested the proceeds in the partnership. The partnership made the mortgage payments on her home from February through September 2006.

Pedrino asked Carlson to "share [her] blessings" by recruiting other investors, which she did. She also gave testimonials at seminars that Pedrino hosted. She then became Pedrino's unpaid employee.

In April 2006, Pedrino held a meeting at Carlson's house. She said that investors in Stonewood could double, triple, or quadruple their money. Pedrino said core clients had to commit to invest for three years, the investment would be in houses, and they would get a 300 percent return. She also said that Montecastro was in charge of Pacific and Stonewood and that she and Montecastro were "working together."

D.     *The Partnership's Use of Investors' Money.*

The money that clients invested never went directly to either Stonewood or Pacific; rather, the clients were instructed to wire it to one of the dummy companies. They were told that Stonewood, Pacific, and the dummy companies were all "sister companies."

With rare exceptions, clients did not receive any prospectuses or statements. When one client asked for a statement for tax purposes, she was told that the partnership "would take care of [her] taxes . . . , that [she] didn't have to worry about a thing."

13

Actually, the money that clients "invested" in the partnership was used to pay "returns" to existing clients. It was also used to make mortgage and credit card payments for existing clients. It was used to make mortgage payments on properties that the partners themselves owned. It was used to pay salaries, referral fees, and other business expenses of the partnership. Finally, it was used to pay Duncan, Montecastro, and Pedrino's personal expenses.

In 2005 through 2007, all told, the partnership paid Montecastro and his wife $3.2 million. It paid Pedrino $320,000. Montecastro was living in a "big house" in Murrieta. He drove a Maserati Quattroporte, leased by the partnership. He wore a Rolex Yacht Master watch.

E.      *The Collapse of the Partnership*.

As Duncan testified, "the whole dynamics of the organization was a house of cards."

Roughly around September 2006, the partnership started running out of cash; it was not able to pay all of its existing clients' "returns" and mortgage payments in a timely manner. When the partnership stopped making payments to one client, he phoned Montecastro, who told him "Don't worry, . . . just hang in there. Things are happening." When another client met with Montecastro, he told her that, if she invested another $250,000, she could get her money back.

Pedrino hosted meetings for clients who were not getting paid. She assured them, "We don't have to worry. We have the money now." Meanwhile, Pedrino doled out

14

money to particular clients who complained about late mortgage payments or who threatened to sue. She funneled the money through a checking account owned by Virly Carlson.

In late 2006, several clients, all represented by attorney Richard Ackerman, sued Stonewood for fraud.

By January or February 2007, the partnership was under investigation by a joint federal and state task force. Montecastro and Duncan told McLeod to bring all of the partnership's records — including computers, files, and loan documents — to Montecastro's home, where Montecastro destroyed them. Meanwhile, Montecastro was researching which countries did and did not have extradition treaties with the United States.

Clients did not get any of their principal back. Those who had refinanced their homes or borrowed against credit cards were left to pay off these debts as best they could. A number of clients lost their homes.

None of the investments offered by the partnership were qualified securities. None of the partnership's employees were licensed to sell securities, nor were any of them licensed to act as a broker-dealer or as an investment advisor.

F.      *Expert Testimony*.

William Michiels, a certified public accountant, testified as an expert in forensic auditing. Although the partnership's own records had been destroyed, he had been able to review bank records.

In Michiels's opinion, the partnership was a classic Ponzi scheme. Altogether, it had raised approximately $29.5 million from investors. However, it had no net assets and no investment activities whatsoever.

George McDonald, former Enforcement Director of the California Department of Corporations, testified as an expert on investment fraud. According to McDonald, the investments marketed by the partnership constituted securities as defined by California law. These securities were unqualified. The partnership and anyone who assisted it was acting as a broker-dealer. The partnership was also acting as an investment advisor.

McDonald testified that the failure to disclose that the partnership was unlicensed, that Duncan had previously received cease and desist orders, and that the money invested was going to earlier investors as well as to the partners' own personal use, all constituted securities fraud. In addition, representations that investors' returns were guaranteed constituted securities fraud.

McDonald also testified that the sale of an investment in foreign currency, precious metals, or gems would be an illegal off-exchange futures contract.

McDonald agreed that the partnership was operating a Ponzi scheme. He also indicated that the partners were engaged in "affinity group fraud" — targeting people who were members of their own church, their own ethnic group, and other groups to which they belonged.

## II

## PROCEDURAL BACKGROUND

A chart summarizing the charges in the information, as well as the outcome of those charges, is attached as Attachment A.

Montecastro was convicted on 304 counts involving 27 victims, as follows:

25 counts of grand theft by false pretenses.

(Pen. Code, §§ 484, subd. (a), 487, subd. (a).)

21 counts of acting as an investment advisor without a license.

(Corp. Code, § 25230, subd. (a).)

72 counts of selling or offering to sell an unqualified security.

(Corp. Code, § 25110.)

69 counts of acting as a broker-dealer without a certificate.

(Corp. Code, § 25210, subd. (a).)

71 counts of securities fraud.

(Corp. Code, § 25401.)

44 counts of commodities fraud.

(Corp. Code, § 29536.)

1 count of financial elder abuse by a non-caretaker.

(Pen. Code, § 368, subd. (d).)

1 count of identity theft.[8]

    (Pen. Code, § 530.5, subd. (a).)

34 enhancements for taking property worth more than $150,000.

    (Pen. Code, § 12022.6, former subd. (a)(2), Stats. 1998,

      ch. 454, § 2.)[9]

57 enhancements for taking property worth more than $50,000.

    (Pen. Code, former § 12022.6, subd. (a)(1), Stats. 1998, ch. 454,

    § 2.)

1 enhancement for a pattern of felony conduct involving the taking of more

    than $500,000.

    (Pen. Code, § 186.11, subd. (a)(2).)

1 enhancement for a pattern of felony conduct involving the taking of more

    than $100,000.

    (Pen. Code, § 186.11, subd. (a)(1).)

Pedrino was convicted on 41 counts involving 5 victims, as follows:

5 counts of grand theft by false pretenses.

1 count of acting as an investment advisor without a license.

---

[8]    This was the only count relating to the corporate victim. All other counts related to the individual victims.

[9]    Due to an intervening change in the law, the trial court later reduced these to enhancements for taking property worth more than $50,000.

11 counts of selling or offering to sell an unqualified security.

12 counts of acting as a broker-dealer without a certificate.

12 counts of securities fraud.

5 enhancements for taking property worth more than $50,000.

1 enhancement for a pattern of felony conduct involving the taking of more than $100,000.

Montecastro was sentenced to a total of 81 years 8 months, in prison, calculated as follows:

Five years (the upper term) on one count of securities fraud (count 5).

One year each (one-third the midterm) on each of the remaining 70 counts of securities fraud, for a subtotal of 70 years.

One year (one-third the midterm) on one count of commodities fraud (count 33).

Eight months (one-third the midterm) on the one count of identity theft (count 210).

Five years (the upper term) on the enhancement for a pattern of felony conduct involving the taking of more than $500,000.

All other counts and enhancements were either sentenced concurrently, stricken, and/or stayed.

Pedrino was sentenced to a total of seven years in prison, calculated as follows:

Three years (the midterm) on one count of securities fraud (count 38).

One year each (one-third the midterm) on three additional counts of

securities fraud (counts 41, 44, and 63), for a subtotal of three years.

One year on the enhancement for a pattern of felony conduct involving the

taking of more than $100,000.

All other counts and enhancements were either sentenced concurrently,

stricken, and/or stayed.

### III

### REFUSAL TO RELIEVE DEFENDANTS OF THEIR WAIVER OF COUNSEL

Both defendants contend that, after they chose to represent themselves, the trial court erred by denying their requests for appointed counsel or advisory counsel.

A.      *Additional Factual and Procedural Background.*

1.      *Montecastro's representation before trial.*

On November 23, 2009, when Montecastro was arraigned, the public defender was appointed to represent him.

On December 4, 2009, Montecastro substituted retained counsel.

On March 24, 2011, Montecastro's retained counsel declared a conflict. On April 8, 2011, conflict counsel was appointed to represent Montecastro.

On August 15, 2011, Montecastro brought a *Marsden* motion,[10] which was denied. His appointed counsel then declared a conflict, and conflict counsel from a different firm was appointed.

On October 24, 2011, Montecastro substituted retained counsel.

On April 9, 2012, the trial court granted a *Faretta* motion by Montecastro.

### 2. *Pedrino's representation before trial*.

On November 23, 2009, when Pedrino was arraigned, the public defender was appointed to represent her.

On December 4, 2009, the public defender declared a conflict and the trial court appointed conflict counsel to represent Pedrino.

On March 16, 2011, for reasons not apparent from the record, conflict counsel from a different firm began representing Pedrino.

On June 17, 2011, Pedrino brought a *Marsden* motion. The trial court denied the motion.

On September 12, 2011, Pedrino indicated that she wanted to bring another *Marsden* motion. The trial court set the motion for hearing on September 22, 2011.

On September 22, 2011, a different attorney from the same conflict panel firm appeared for Pedrino. Pedrino stated, "I object. . . . This man, I don't know him, and

---

**10** A *Marsden* motion is a motion to discharge appointed counsel, based on ineffective assistance, and to appoint new counsel. (*People v. Marsden* (1970) 2 Cal.3d 118.)

21

he's not representing me." She insisted that she still wanted to present her *Marsden* motion with respect to her previous attorney. The trial court ruled that Pedrino's *Marsden* motion was moot.

On October 24, 2011, Pedrino filed a document purporting to terminate her appointed counsel unilaterally. At the next hearing, on November 10, 2011, the trial court initially viewed this as a *Marsden* motion. Pedrino, however, indicated that she was actually making a *Faretta* motion, which the trial court then granted.

### 3. *Defendants' request for a continuance to retain counsel.*

In sum, then, as of July 5, 2012, both defendants were in pro per. On that date, a jury panel was sworn and voir dire began.

On July 9, 2012, during voir dire, both defendants requested a 90-day continuance so that they could retain counsel. Montecastro indicated that, in the "wors[t] case" scenario — i.e., if he proved unable to retain counsel — he would seek appointed counsel.

The trial court commented, "[I]n the past I've granted a motion when we were actually in the midst of trial where jeopardy had attached for a gentleman who was representing himself and decided that he did need an attorney at that time. That is a slightly different situation than we have here." It asked defendants to confirm that, after the 90 days had passed, they would be prepared to proceed to trial. They agreed that they would. It then granted the motion. It stated, "If you find that you're unable to retain counsel . . . , you can apply to the Court for appointment of the public defender . . . ."

22

4.    *Requests for appointed counsel during trial.*

On October 31, 2012, the case was called for trial. Defendants had not retained counsel and had not requested appointed counsel; thus, they were still in pro per.

On November 1, 2, 5, and 6, 2012, defendants argued pretrial motions, including a motion to dismiss. Meanwhile, on November 2, 2012, the trial court started the process of time-qualifying prospective jurors.

On November 7, 2012, the trial court denied defendants' motion to dismiss. Montecastro then requested appointed counsel. He stated, "I'm not qualified to represent myself in this proceeding."

The trial court denied Montecastro's request. It explained: "[W]e've been through this before. Trial was delayed for almost four months upon your request to recess a pending trial in July in order to retain counsel. [¶] I think this is being brought for purposes of delay only at this time. I would much prefer that you have an attorney, but also, this case must move forward."

Montecastro claimed he did not know how to do jury selection, subpoenas, a witness list, or cross-examination, and again, he requested appointed counsel. Again, the trial court denied the request.

On November 8, 2012, voir dire of individual jurors began. After the trial court had asked some questions, and immediately before defendants started asking questions, the trial court took a short break. Outside the presence of the jury, Montecastro requested

23

"reconsideration . . . with respect to assistance of counsel." The trial court denied the request.

On November 9, 2012, the prosecutor objected that, during voir dire, defendants had indicated to the jurors that they were not in pro per voluntarily. The trial court ordered them not to do so.

Less than 45 minutes later, during voir dire, there was this exchange:

"DEFENDANT PEDRINO: . . . Is there anyone who believes that, you know, I'm crazy to be doing this on my own? Would you raise your hand please. That I should have a lawyer. Would you please keep your hands up that I should have a lawyer.

"TJ09: I'm not going to state that you're crazy. Seems like a very big task to take on.

"DEFENDANT PEDRINO: . . . I'm scared now because the last time I hear you, you were horribly looking at me, and it's like why the hell are you doing it on your own. So I motion this Court, I would like to have a lawyer, sir."

The trial court called a recess. It found that Pedrino had violated its order not to tell jurors that she was in pro per against her will. In response, defendants requested appointed counsel. Montecastro claimed that, in initially requesting counsel, he had relied on the trial court's statement that it had once granted a request for the appointment of counsel in midtrial.

The trial court denied the request. It stated, "I do find that the request for the appointment of counsel is brought solely for the purposes of delay . . . ." "And I would

24

further find that no competent attorney would undertake representation at this time without an assurance of having at least several months ability to prepare before proceeding to trial."

On December 7, 2012, in the middle of cross-examining a witness, Montecastro declared, "I don't have an attorney, . . . so I don't know procedure." In front of the jury, he requested advisory counsel. The trial court denied the request.

On December 10, 2012, the trial court sustained an objection to one of Montecastro's questions as argumentative. In response, in front of the jury, Montecastro requested advisory counsel, stating, "The objections are being sustained and I don't understand them." The trial court denied the request.

On December 12, 2012, the prosecutor noted, "[T]he defendants have both repeatedly violated the court order to stop referring to the fact that they're not represented by attorneys." The trial court ordered, "[R]enewed motions for counsel are to be made outside of the presence of the jury." Both defendants then requested advisory counsel. Montecastro stated, "I'm not asking for a continuance, I'm not asking for delay of these proceedings." The trial court denied the request.

On January 3, 2013, Montecastro asked another argumentative question. The trial court admonished him not to do so again. In front of the jury, Montecastro asked, "[C]an I have an attorney for procedural advice?" The trial court denied the request.

On January 8, 2013, outside the presence of the jury, both defendants requested advisory counsel. Once again, Montecastro assured the trial court that he was not asking for a continuance or a delay. The trial court denied the request.

On January 9, 2013, the trial court sustained an objection to yet another of Montecastro's questions as argumentative. In front of the jury, he responded, "Motion for an attorney . . . ." The trial court denied the motion.

On January 15, 2013, when the prosecutor objected to one of Montecastro's questions based on Evidence Code section 352, he said, in front of the jury, "I'm not an attorney, sir, and I am requesting an attorney." The trial court replied, "I understand."

On January 30, 2103, outside the presence of the jury, Pedrino requested an attorney to help her bring a motion for acquittal under Penal Code section 1118.1. The trial court denied the request.

Finally, on February 28, 2013, during a discussion of exhibits and further witnesses, Montecastro stated, "I don't have an attorney. . . . I don't know what all the legal issues are. I don't know the procedure. I don't know . . . without having an attorney. I need an attorney." Pedrino similarly requested "a procedural lawyer." The trial court denied the requests, stating, "Appointment of counsel at this time would result in undue delay . . . ."

B.    *Discussion*.

Under *Faretta*, "[d]efendants in criminal cases have a federal constitutional right to represent themselves. [Citation.]" (*People v. Johnson* (2012) 53 Cal.4th 519, 523.)

26

"[O]nce there ha[s] been a knowing and intelligent waiver of the right to counsel, there [i]s no absolute right for a defendant to change his mind after a trial has started and then to demand counsel." (*People v. Elliott* (1977) 70 Cal.App.3d 984, 991.)

"When a criminal defendant who has waived his right to counsel and elected to represent himself under *Faretta* . . . seeks, during trial, to revoke that waiver and have counsel appointed, the trial court must exercise its discretion under the totality of the circumstances . . . . [Citation.]" (*People v. Lawrence* (2009) 46 Cal.4th 186, 188.) It "should consider, along with any other relevant circumstances, '(1) defendant's prior history in the substitution of counsel and in the desire to change from self-representation to counsel-representation, (2) the reasons set forth for the request, (3) the length and stage of the trial proceedings, (4) disruption or delay which reasonably might be expected to ensue from the granting of such motion, and (5) the likelihood of defendant's effectiveness in defending against the charges if required to continue to act as his own attorney.' [Citation.]" (*Id*. at p. 192.)

Here, both defendants had an extensive history of changes of counsel.[11] Both of them had brought unfounded *Marsden* motions. "[A] defendant's proclivity to seek

---

[11]    When defendants were representing themselves, they kept raising the same frivolous arguments (including some typical of the "sovereign citizen" movement). For example, they insisted that their names not be spelled in all capital letters. They asserted rights under the Uniform Commercial Code. They argued that their right to a jury of their peers meant jurors of their ethnicity, who had the same background, education, and occupation as they did, and who were "constitutionalists" like them. It appears that at least part of the reason for their conflicts and dissatisfaction with their counsel was that licensed attorneys were not willing to make such arguments.

changes in counsel status will generally weigh against finding an abuse of discretion . . . ." (*People v. Lawrence*, *supra*, 46 Cal.4th at p. 196.) The most significant part of their histories, however, was that the case had already gone to trial once, only to be brought to a screeching halt, supposedly so defendants could obtain counsel. They had been given 90 days for this purpose (which ultimately stretched to approximately 120 days). The trial court indicated that, during this time, if they could not retain counsel, it would be willing to appoint counsel for them. Instead, they persisted in representing themselves until the eve of trial and beyond.

The reason set forth for the request was that defendants were not qualified to represent themselves. However, when they brought their *Faretta* motions, they had been cautioned extensively about this. Moreover, they had already had to prepare once for a trial date in July 2012; then they had to prepare again for a new trial date in October 2012. It is simply inconceivable that they did not *realize* that they were not qualified sometime sooner. Thus, from the timing of the request, the trial court could reasonably conclude that the true reason for it was to sow delay and error.

Montecastro cites comments that some of the jurors made during voir dire to the effect that defendants were doing a poor job of representing themselves. He asks us to infer that these comments "undoubtedly" led him to realize for the first time that he was not qualified. We disagree, for three reasons. First, the jurors made these comments on November 13 and 14 — *after* defendants first requested the appointment of counsel, and *after* they had already launched their campaign of trying to make the jury feel sorry for

them.  Second, on November 7, Montecastro claimed that he was not qualified to draft a witness list, to issue subpoenas, or to cross-examine.  These are all matters he would already have realized during trial preparation.  Third, Montecastro upends the applicable standard of review; he asks us to draw the inference most favorable to him, rather than the inference most favorable to the trial court's ruling.  (See *In re M.V.* (2014) 225 Cal.App.4th 1495, 1506-1507.)  We decline to do so.

The third factor — the length and stage of the trial proceedings — weighs heavily against defendants.  When the trial began, the case had been pending for almost three years.  Montecastro did not seek to revoke his *Faretta* waiver until the trial court had already been hearing pretrial motions for five days and prequalifying jurors for four days.  The timing of Pedrino's first request was even more egregious.  During voir dire, after the trial court had already warned defendants not to tell the jury that they had been forced to proceed in pro per, Pedrino asked for appointed counsel in front of the jury.  The trial court quite properly viewed this as a attempt to manipulate the jury pool.  Defendants proceeded to confirm this view by repeatedly requesting counsel in front of the jury.

Next, granting defendants' request would have resulted in delay and disruption.  The trial court found that no competent attorney would agree to represent defendants unless he or she had, at a minimum, "several months" to prepare.

Defendants argue that there was no evidence that delay would *actually* have resulted, because the trial court did not make any inquiries to the public defender or to conflict counsel.  However, defendants, as the moving parties, had the burden of proof.

(Evid. Code, § 500; *People v. Lopez* (1997) 52 Cal.App.4th 233, 251; see *People v. Mellor* (1984) 161 Cal.App.3d 32, 37 [defendant claiming *Faretta* motion was erroneously granted has burden of proving that he did not intelligently and knowingly waive his right to counsel] [Fourth Dist., Div. Two].)  Thus, in the absence of evidence that delay would *not* result, the trial court could properly find that it *would*.

Separately and alternatively, this is the type of finding that the trial court can properly make based on its own experience and expertise.  For example, in deciding whether a prosecutor is exercising peremptory challenges based on group bias, a trial court is allowed to consider its "' . . . knowledge of local conditions and of local prosecutors.' [Citation.]" (*People v. Wheeler* (1978) 22 Cal.3d 258, 281.)  Similarly, "trial judges are particularly well suited to observe courtroom performance and to rule on the adequacy of counsel in criminal cases tried before them.  [Citation.]" (*People v. Fosselman* (1983) 33 Cal.3d 572, 582.)  When the trial court is called on to award reasonable attorney fees, "' . . . [t]he value of legal services performed in a case is a matter in which the trial court has its own expertise.  [Citation.]  The trial court may make its own determination of the value of the services contrary to, or without the necessity for, expert testimony.  [Citations.] . . . .' [Citation.]" (*PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1096.)  And even jurors are entitled "to use their experience in evaluating and interpreting th[e] evidence." (*People v. Steele* (2002) 27 Cal.4th 1230, 1266.)

Defendants now argue that one of the attorneys who had previously been appointed to represent them *might* have been willing to take the case on immediately,

because they were already familiar with it. This is sheer speculation. If that were true, all that defendants had to do was contact those attorneys, get one to agree to take the case, and have that attorney so testify. The trial court did not have to carry out that investigation for them.[12]

Defendants also argue that, to the extent that they were requesting only advisory counsel, there would have been no delay. While Montecastro repeatedly assured the trial court that he was not seeking a continuance or a delay, the trial court did not have to accept that assurance. An attorney, even in a purely advisory role, could not give Montecastro advice that would be both ethical and reliable without having a thorough grounding in the file — the charges, the discovery, the trial court's prior rulings, etc. And, as the trial court had already quite properly found, that would take time.

Apparently Montecastro pictured an attorney who would act like a kind of walking legal dictionary — not speaking except when spoken to, and even then merely answering limited and abstract legal questions divorced from the case, such as, "What is hearsay?"

---

[12] We recognize that in *People v. Cruz* (1978) 83 Cal.App.3d 308, the appellate court questioned a deputy public defender's estimate that appointment of counsel would result in a three-week delay, because (1) he "was not . . . the attorney who would have actually handled the case," and (2) "[a] truer estimate of the time required could have been obtained through the court calling in a deputy public defender who had the capability and authority to handle the case." (*Id*. at pp. 320-321.) Ultimately, however, it accepted that there would have been a three-week delay. (*Id*. at p. 321.) Thus, we do not read *Cruz* as imposing a duty on the trial court to make inquiries to a potential defense attorney. Even if it could be so construed, however, we believe it simply is not feasible to require the trial court itself to inquire to all of the various appointed counsel who were involved in this case at one time or another.

31

The trial court itself could answer such questions, and it did so from time to time throughout the trial. However, the usefulness of such advice was limited, because Montecastro lacked the ability (or, more likely, the willingness) to apply it to particular situations. One needs more than a definition of hearsay to wield the concept effectively under trial conditions.

"[A]dvisory counsel and other forms of 'hybrid' representation are not constitutionally guaranteed. [Citation.] Thus, as with other matters requiring the exercise of discretion, 'as long as there exists a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be here set aside . . . . [Citations.]' [Citation.]" (*People v. Clark* (1992) 3 Cal.4th 41, 111.)

The denial of a timely request for advisory counsel may be an abuse of discretion when the case is unusually complex and the defendant is unusually unfamiliar with the law. (See *People v. Bigelow* (1984) 37 Cal.3d 731, 743-744.) This presupposes, however, that advisory counsel's job is to help the defendant make sound strategic decisions based on *all* of the facts and law involved in the case. Thus, as the trial court concluded, even advisory counsel would have needed substantial time to prepare.

Defendants argue that the trial court applied an erroneous legal standard to their request for advisory counsel. They note that, after Montecastro requested "back-up counsel so I can understand [the] procedure," the trial court responded: "Appointed counsel either represents you or they don't. It's an all-or-nothing proposition. There's no attorney that would come in at this stage and assume the trial at this point. So I'll decline

32

at this time to appoint counsel for the purpose you're requested." Shortly after that, it added, "A delay of [*sic*; sc. for?] counsel would wind up resulting in a delay of months, because that attorney is not going to partially represent you. The attorney would be required to represent you for all purposes. There's no such thing as a partial appointment." Defendants argue that it evidently misunderstood the role of advisory counsel.

This omits the trial court's statement just moments earlier, "I'm not going to appoint stand-by or back-up counsel at this point. Appointed counsel won't take these particular positions anyway, except in extraordinary circumstances, and it would unduly delay these proceedings in any event." Thus, it was aware of the distinction. It was just making the same point that we just made above — advisory counsel would have to prepare the same way that appointed counsel would, so that the distinction was illusory under the circumstances of this case.

The fifth factor — the likelihood that the defendant can defend effectively — is the only one that weighs in defendants' favor at all.[13] However, it does not tip the scales. In *People v. Lawrence*, *supra*, 46 Cal.4th 186, the Supreme Court stated: "[D]efendant's asserted ineffectiveness at self-representation does not demonstrate an abuse of

---

[13] The trial court could reasonably find that defendants were not nearly the babes in the woods that they claimed to be. For example, they protested that they did not understand the meaning of an "argumentative" question or a "352" objection. It appeared, however, that this was a ruse; it enabled them to persist in asking questions that were likely to prejudice the jury even if an objection was made and sustained.

discretion. Defendant was untrained in the law and may not have been especially experienced in court procedures, but the same could be said of many, if not most, in propria persona criminal defendants. That defendant's defense would have been more effectively presented (or a better sentence obtained through a negotiated plea) had he been represented is likely. But if that fact were determinative, virtually all self-representing defendants would have the right to revoke their counsel waivers at any time during trial. That is not the law. [Citations.]" (*Id*. at p. 196.)

Finally, Montecastro argues that the trial court "misled" him by stating that, once before, it had granted a request to appoint counsel in the middle of trial. However, the trial court did not indicate that it would do so as a matter of course; quite the contrary, it implied that that was unusual. Moreover, it immediately added, "That is a slightly different situation than we have here." It asked defendants to confirm that, if it granted the 90-day continuance that they were requesting, they would then be prepared to proceed to trial; they promised that they would. Thus, it would be completely unreasonable for Montecastro to believe that, even if he failed to obtain counsel during the continuance, he could still request appointed counsel after the trial started.

We therefore conclude that the trial court did not abuse its discretion by denying defendants' requests to appoint either trial counsel or advisory counsel.

34

IV

JURY INSTRUCTIONS ON AGENCY

Pedrino contends that the trial court erred by instructing on agency principles.[14]

A.      *Additional Factual and Procedural Background.*

The trial gave standard instructions on aiding and abetting (CALCRIM No. 400, 401, 402) and on conspiracy (CALCRIM No. 416, 417, 418, 419).

In addition, the prosecution requested the following jury instruction:

People's Requested Instruction No. 20:  "A person cannot escape criminal responsibility merely because he used an agent, innocent or otherwise, as his

---

[14]      Montecastro joins in all arguments by Pedrino "which may accrue to [his] benefit . . . ."  Nevertheless, we deem him to have forfeited this particular argument.

"Appellate counsel for the party purporting to join some or all of the claims raised by another are obligated to thoughtfully assess whether such joinder is proper as to the specific claims and, if necessary, to provide particularized argument in support of his or her client's ability to seek relief on that ground.  If a party's briefs do not provide legal argument and citation to authority on each point raised, '"the court may treat it as waived, and pass it without consideration.  [Citations.]"'  [Citation.]  'Joinder may be broadly permitted [citation], but each appellant has the burden of demonstrating error and prejudice [citations].'  [Citation.]"  (*People v. Bryant* (2014) 60 Cal.4th 335, 363-364.)

Here, Pedrino argues extensively that the asserted error was prejudicial with respect to her.  By contrast, neither Montecastro nor Pedrino has argued that it was prejudicial with respect to Montecastro.

In any event, the asserted error was harmless as to Montecastro under any standard.  The evidence was overwhelming that the partnership was a criminal conspiracy and that, while it may have had some innocent employees, Montecastro was at its head.  Thus, it is simply inconceivable that the jury found him guilty on an agency theory but not on a conspiracy theory.

instrumentality.  It is no defense that the criminal acts were actually performed by others. However, in order for the defendant to be criminally liable for the acts of another, such acts must be authorized or otherwise approved by the defendant."

The trial court observed, "This seems to me to be a little bit duplicative of instructions as to accomplice or aiding and abetting."  The prosecutor argued that aiding and abetting requires that the perpetrator intend to commit the crime, and therefore the requested instruction was necessary to communicate that a defendant could commit the crime through a wholly innocent perpetrator.  The trial court then agreed to give the instruction.

Initially, the prosecution also requested the following two instructions:

People's Requested Instruction No. 26:  "In regards to Corporations Code section 25401, a principal is criminally liable for his agent's act if the act is done within the scope of the employment, irrespective of any personal knowledge or immediate direction on the part of the principal.

"If the principal exercised no control over the agent, was unaware of the agent's act, and did not acquiesce in the act, then he is not liable."

People's Requested Instruction No. 27:  "In regards to Corporations Code section 25110, . . . a principal is criminally liable for his agent's act if the act is done within the scope of the employment, irrespective of any personal knowledge or immediate direction on the part of the principal.

"If the principal exercised no control over the agent, was unaware of the agent's act and did not acquiesce in the act, then he is not liable."

At the instructions conference, the prosecutor withdrew her request for these instructions because they were "duplicative." Montecastro then affirmatively requested them. The trial court agreed to give them.

B.      *Discussion*.

1.      *Forfeiture*.

Preliminarily, the People contend that Pedrino forfeited the asserted error by failing to object to the instructions at trial. They cite cases stating that "'[g]enerally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' [Citation.]" (*People v. Guiuan* (1998) 18 Cal.4th 558, 570; accord, *People v. Lang* (1989) 49 Cal.3d 991, 1024.) Pedrino, however, is arguing that the instructions were *not* "correct in law." An objection is not necessary to preserve a claim that an instruction violated a defendant's substantial rights. (Pen. Code, § 1259; *People v. Boyce* (2014) 59 Cal.4th 672, 691, fn. 12.)

The People also contend that the asserted error was invited because Montecastro supposedly requested the challenged instructions. (Actually, he requested only two out of three of them). Pedrino, however, did not join in his request. Hence, she "is not tainted on appeal with the error invited by h[er] codefendant[] . . . ." (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 372.)

37

## 2. *People's Requested Instruction No. 20.*

"'A person aids and abets the commission of a crime when he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' [Citation.]" (*People v. Delgado* (2013) 56 Cal.4th 480, 486, fn. omitted.) "'[A] person who aids and abets the commission of a crime is a "principal" in the crime, and thus shares the guilt of the actual perpetrator.' [Citation.]" (*People v. Smith* (2014) 60 Cal.4th 603, 611.)

Pedrino argues that People's Requested Instruction No. 20 was inconsistent with standard aiding and abetting principles because it allowed the jury to find her "criminally liable for the acts of another" as long as she merely "authorized or otherwise approved" those acts.

As authority for People's Requested Instruction No. 20, the prosecution cited *People v. Conway* (1974) 42 Cal.App.3d 875. There, the appellant was the president of a car dealership. (*Id.* at p. 879.) On five separate occasions, employees of the dealership induced the sale of cars by making false representations to the buyers. (*Id.* at pp. 879-884.) The appellant personally made some of the false representations, but only on one of these occasions. (*Id.* at pp. 881-882.) Nevertheless, he was convicted on five counts of false advertising (Bus. & Prof. Code, § 17500). (*Conway* at p. 878.)

The appellate court found "sufficient evidence that appellant authorized the unlawful activity." (*People v. Conway*, *supra*, 42 Cal.App.3d at p. 886.) It concluded

38

that "appellant may be held criminally liable because as president of the dealership, he had the requisite control over the activities of the dealership and permitted the unlawful practices to continue after being informed of them on numerous occasions." (*Ibid*.)

After *Conway* was decided, our Supreme Court substantially clarified the law of aiding and abetting in cases such as *People v. Croy* (1985) 41 Cal.3d 1 and *People v. Beeman* (1984) 35 Cal.3d 547. Nevertheless, *Conway* has never been overruled. Moreover, it is consistent with the definition of aiding and abetting stated in those cases. It is hard to see how a defendant could "authorize" or "approve" the commission of a crime by another person without intending the commission of the crime or without aiding, promoting, or encouraging the commission of the crime.

Pedrino argues that the instruction did not require that the approval be communicated to the perpetrator. She also argues that it did not require that the approval actually encourage the commission of the crime. The instruction, however, started out by stating that "A person cannot escape criminal responsibility merely because he used an agent . . . as his instrumentality." It then went on to state exactly *when* a person who used an agent as his instrumentality *could* be held criminally responsible. Thus, when taken as a whole, it adequately conveyed the requirement that the defendant's authorization or approval must cause the crime.

This is not to say that we wholly approve of instructing a jury based on *Conway*. As already noted, *Conway* is, at best, outdated. Evidently the prosecutor wanted an instruction on the concept that a defendant can commit a crime through an innocent agent.

However, the instruction as given dealt with the commission of a crime through "an agent, innocent *or otherwise*." If it is necessary to instruct on the commission of a crime through an innocent agent, it is probably best to keep that concept distinct from the commission of a crime through a guilty perpetrator — i.e., from aiding and abetting. (See *People v. Simon* (1995) 9 Cal.4th 493, 522, fn. 19.)[15]

Even so, we conclude that, under the circumstances of this case, it is not reasonably likely that People's Requested Instruction No. 20 led the jury to misunderstand the law.

### 3. *People's Requested Instruction No. 26 and No. 27.*

Pedrino also argues that People's Requested Instructions No. 26 and 27 were inconsistent with standard aiding and abetting principles.

We agree. These instructions provided that a defendant could be guilty of a crime committed by an agent within the scope of the agent's employment, even if the defendant did not know what the agent was doing, just as long as the defendant exercised control over the agent. Thus, they did not require that the defendant know of the agent's

---

[15] Pedrino also argues that the trial court erred by failing to define "agent." In developing this argument, however, she focuses solely on People's Requested Instructions No. 26 and No. 27, which we discuss below; she does not address it with respect to People's Requested Instruction No. 20.

This argument does not really apply to People's Requested Instruction No. 20, because that instruction was still correct even if the jury understood "agent" as broadly as possible, i.e., as meaning any other person. Any narrower interpretation could only have redounded to Pedrino's benefit.

40

unlawful purpose; they did not require that the defendant have the intent that the crime be committed; and they did not require that the defendant do anything to aid, promote, encourage or instigate the crime.

"The tort doctrine of respondeat superior [citation] has no application to crimes requiring criminal intent. Hence, there is no liability of a principal in the sense in which the term is used in the law of agency. Criminal liability cannot be imposed for the criminal act of the agent unless the principal is a party to it, i.e., unless the principal aids and abets or commands the act. [Citations.]" (1 Witkin, Cal. Crim. Law 4th (2012) Introduction to Crimes, § 115, pp. 191-192.)

Under *Conway*, as discussed in part IV.B.2, *ante*, a corporate officer can be held liable for the criminal acts of the corporation's employees if the officer knew of the acts *and* had the ability to control them. (Accord, *Sea Horse Ranch, Inc. v. Superior Court* (1994) 24 Cal.App.4th 446, 457-459.) The instructions here, however, indicated that either knowledge alone, without ability to control, or ability to control alone, without knowledge, would be sufficient. That is not the law.

The People seem to have drafted these instructions to summarize the theory of "control person liability" for securities fraud. (Corp. Code, § 25504; see generally *Hellum v. Breyer* (2011) 194 Cal.App.4th 1300, 1310-1314.) The problem is that control person liability applies only to civil securities fraud, not criminal securities fraud. (Corp. Code, § 25504.)

41

Criminal securities fraud comes with its own statutory form of vicarious liability. Corporations Code section 25403, as relevant here, provides:

"(a) Every person who with knowledge directly or indirectly controls and induces any person to violate any provision of this division or any rule or order thereunder shall be deemed to be in violation of that provision, rule, or order to the same extent as the controlled and induced person.

"(b) Any person that knowingly provides substantial assistance to another person in violation of any provision of this division or any rule or order thereunder shall be deemed to be in violation of that provision, rule, or order to the same extent as the person to whom the assistance was provided.

"(c) It shall be unlawful for any person directly or indirectly to do any act or thing which would be unlawful for that person to do under any provision of this division or any rule or order thereunder through or by any other person."

People's Requested Instructions No. 26 and 27 were inconsistent with Corporations Code section 25403, subdivisions (a) and (b), again because these instructions did not require knowledge.

Corporations Code section 25403, subdivision (c) does not expressly require that the defendant act knowingly. Nevertheless, our Supreme Court "ha[s] construed criminal statutes to include a guilty knowledge requirement even though the statutes did not expressly articulate such a requirement. [Citation.]" (*Stark v. Superior Court* (2011) 52

Cal.4th 368, 393.)  Thus, People's Requested Instructions No. 26 and 27 were also inconsistent with this subdivision.

The errors affecting People's Requested Instructions No. 26 and 27, however, were harmless under any standard.  People's Requested Instruction No. 26, by its terms, applied exclusively to securities fraud (Corp. Code, § 25401).  Likewise, People's Requested Instruction No. 27 applied exclusively to selling or offering to sell an unqualified security (Corp. Code, § 25110).  The jury, however, found Pedrino guilty, not only of these crimes, but also of every other crime with which she was charged — grand theft by false pretenses (Pen. Code, §§ 484, subd. (a), 487, subd. (a)), acting as a broker-dealer without a certificate (Corp. Code, § 25210, subd. (a)), and/or acting as an investment advisor without a license (Corp. Code, § 25230, subd. (a)) — as to every alleged victim and on every alleged date.  Thus, evidently it did not find it necessary to rely on the erroneous theory of vicarious liability stated in People's Requested Instructions No. 26 and 27.  To put it another way, even if the trial court had not given these instructions, the jury would still have found Pedrino guilty on all of the same charges.

V

JURY INSTRUCTIONS ON

THE NATURAL AND PROBABLE CONSEQUENCES DOCTRINE

In her opening brief, Pedrino contended that the jury instructions regarding the natural and probable consequences doctrine were erroneous.  In her reply brief, however,

43

she concedes that "*People v. Smith*[, *supra*,] 60 Cal.4th 603, handed down after [her] opening brief was filed[,] . . . addressed and rejected the claim made by [Pedrino] in this matter." We accept this concession, and thus we do not discuss the issue further.

VI

THE SUFFICIENCY OF THE EVIDENCE AS TO VICTIM BREEN

Montecastro contends that there is insufficient evidence to support his convictions on the counts relating to victim Christopher Breen (counts 32-33).

A. *Additional Factual and Procedural Background*.

With respect to Breen, Montecastro was charged in Count 32 with selling or offering to sell an unqualified security and in Count 33 with commodities fraud.

Breen testified that in late 2006, a person he met briefly — he did not remember the person's name — told him about an opportunity to buy a home with a minimal down payment. He gave that person his card.

Within a week, a person named Karen Taloza emailed him. She indicated that she worked for Pacific. She said that Pacific was offering to help people with the down payment, mortgage payments, and repair costs of a house.

After a series of phone calls, emails, and faxes between Breen and Taloza, it was agreed that Breen would buy a particular house in Murrieta. When he got the loan paperwork, however, friends and relatives in the real estate industry advised him that it was a bad deal, so he told Taloza he did not want to proceed.

44

Breen also testified: "[Taloza] mentioned there are other monetary investments and gold, silver investments that if I wanted to look at, I could. But from the get-go, I said the only thing I cared about was real estate. . . . They did not bother me on the currencies once I said no."

B.    *Taloza's Connection to Montecastro*.

Montecastro argues that there was insufficient evidence that Taloza was acting on his behalf.

There was ample evidence that Montecastro and his partner Duncan conspired to operate Pacific as a fraudulent enterprise. Employees of Pacific — whether they were in on the fraud or not — were their agents in this fraudulent scheme. (*People v. Rowe* (2014) 225 Cal.App.4th 310, 320 ["a person's use of an innocent agent does not absolve the person of criminal culpability."].) And Taloza told Breen that she worked for Pacific.

Thus, Montecastro is apparently relying on the general rule that "'[a]gency cannot be established by the declarations of the agent not under oath . . . .' [Citation.]" (*Clifton Cattle Co. v. Thompson* (1974) 43 Cal.App.3d 11, 20, italics omitted.) However, documents that Taloza sent Breen were admitted into evidence. One was an offer to purchase a house, which Taloza wanted Breen to sign; the seller was listed as Total Return. If Breen had gone ahead with the purchase, it was Total Return that would have benefited. Total Return was one of the dummy companies that the partnership set up. This was sufficient evidence that Taloza was actually acting for Montecastro's criminal enterprise.

45

C.    *Commodities Fraud.*

Montecastro argues that Taloza's mere "mention[]"of possible commodity investments was insufficient evidence of an offer to sell a commodity.

Under the commodities fraud statute:

"It is unlawful for any person, directly or indirectly, in connection with the purchase or sale of, *the offer to sell*, the offer to purchase, the offer to enter into, or the entry into, a commodity, commodity contract, or commodity option to do any of the following:

"(a)  To willfully employ any device, scheme, or artifice to defraud.

"(b)  To willfully make any false report, enter any false record, make any untrue statement of a material fact, or omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

"(c)  To willfully engage in any transaction, act, practice, or course of business which operates or would operate as a fraud or deceit upon any persons.

"(d)  To willfully misappropriate or convert the funds, security, or property of any other person."  (Corp. Code, § 29536, italics added.)

In the field of contract law, "'''[a]n offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.'''  [Citations.]'  [Citation.]" (*Donovan v.*

46

*RRL Corp.* (2001) 26 Cal.4th 261, 271.)  However, there is no reason to suppose that the commodities fraud statute uses this narrow contract law definition.

Somewhat to the contrary, for purposes of securities fraud, "'[o]ffer' or 'offer to sell' includes every attempt or offer to dispose of, *or solicitation of an offer to buy*, a security or interest in a security for value."  (Corp. Code, § 25017, italics added.)  While this definition does not apply to commodities fraud of its own force (see also Corp. Code, § 25001), it does indicate that the contract law definition need not be controlling in this area.

Montecastro relies on the definition of offer in Black's Law Dictionary (9th ed. 2009) as "[t]he act or instance of presenting something for acceptance."  The most recent edition of Black's, however, defines offer as "[t]he act or an instance of presenting something for acceptance; specif., *a statement that one is willing to do something for another person or to give that person something . . . .*"  (Black's Law Dictionary (10th ed. 2014), italics added.)  Thus, it makes it clear that the definition in the Ninth Edition was not limited to the contract law definition; rather, it included preliminary proposals.  This meaning is similar to the dictionary definition of offer as "an expression of intention or willingness to give or do something if desired . . . ."  (Oxford English Dict. Online (3d ed. 2007; online version Jun. 2015) <http://www.oed.com/view/Entry/130619>, def. 1.a [as of Sept. 27, 2015].)

Here, Taloza indicated that Pacific was willing to supply investments in foreign currency, gold, and silver. While Breen did not take her up on it, this was sufficient evidence of an offer to sell for purposes of commodities fraud.

VII

THE SUFFICIENCY OF THE EVIDENCE

OF PARTICULAR COUNTS OF COMMODITIES FRAUD

Montecastro contends that certain particular counts of commodities fraud are not supported by sufficient evidence of the sale of or an offer to sell a commodity.

"'""When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence — that is, evidence that is reasonable, credible, and of solid value — from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." [Citation.] We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citation.] In so doing, a reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." [Citation.]' [Citation.]" (*People v. McCurdy* (2014) 59 Cal.4th 1063, 1104.)

"'Commodity' means . . . any agricultural, grain, or livestock product or byproduct, any metal or mineral . . . , any gem or gemstone . . . , any fuel . . . , any foreign currency,

and all other *goods, articles, products*, or items of any kind." (Corp. Code, § 29504, italics added.)

While this definition is very broad, it does not encompass real property. Real property is not a "good," an "article," or a "product." At a stretch, it might be considered an "item." However, under the principle of ejusdem generis (see generally *In re Corrine W.* (2009) 45 Cal.4th 522, 531), we construe the definition as limited to "goods, articles, products, or items" that are similar to the ones listed. These are all fungible items of personal property commonly traded in bulk. We find no indication that the legislature intended to penalize fraudulent real estate transactions as "commodities fraud."

A. *Counts 13, 21, and 25: David Berman*.

1. *Additional factual and procedural background*.

With respect to victim David Berman, Count 9 charged commodities fraud on or about July 27, 2006. Count 13 also charged commodities fraud on or about July 27, 2006. Count 21 charged commodities fraud on or about August 4, 2006. Count 25 charged commodities fraud on or about September 26, 2006.

On July 27, 2006, Berman invested $100,000 in "[f]oreign currency," specifically "[d]inar[s]."

On or about the same date, Berman separately invested $54,525. This money came from credit cards.

On August 4, 2006, Berman invested $16,319. Once again, this money came from credit cards.

On September 26, 2006, Berman invested $19,000. Yet again, this money came from credit cards.

Initially, regarding the $54,525, the $16,319, and the $19,000, Berman testified, "I can't remember if those . . . went to the dinar[s] or if they went to the property flipping. It was one of the two."

However, after his recollection was refreshed (by showing him his previous statements to a prosecution investigator), he testified that "all the credit card money" was invested in "[f]lipping properties."

2.      *Discussion*.

There was ample evidence that Berman paid the $100,000 to buy a commodity, namely dinars.

By contrast, there was no evidence that either the $54,525, the $16,319, or the $19,000 was paid in connection with the sale of a commodity. At one point in the trial, Berman simply did not remember whether they were intended to buy dinars or condominiums. The People claim that Berman testified that they were intended to buy *both* dinars *and* condominiums. This interpretation, however, is irreconcilable with Berman's statement, "I can't remember if those . . . went to the dinar[s] or if they went to the property flipping. *It was one of the two*." (Italics added.) We see no way a rational juror could find, beyond a reasonable doubt, based on this uncertain testimony, that the

50

money was for buying dinars.  This is particularly true because, once his recollection was refreshed, Berman testified that it was for real property.

The People proceeded below on the theory that there could be one count of commodity fraud per sale of or offer to sell a commodity.  They have never argued that there could be one count of commodity fraud per fraudulent *representation*, regardless of how many sales or offers to sell there were.  We deem any such contention forfeited.

We therefore conclude that there was insufficient evidence of a sale or any offer to sell any commodity to support Montecastro's convictions on counts 13, 21, and 25.

B.  *Count 84:  Leonila and Ron Elsman on December 27, 2006.*

1.  *Additional factual and procedural background.*

Count 84 charged commodities fraud on or about December 27, 2006 with respect to victims Leonila and Ron Elsman.

In October 2006, the Elsmans invested $36,000.  On December 1, 2006, they invested $8,000.  On December 26, 2006, they invested $30,572.82.  Leonila Elsman was told that "they're going to invest the money outside the U.S."  Beyond that, she could not say how the money was going to be invested.  Nobody ever talked to her about investing in foreign currency.

2.  *Discussion.*

The People claim Elsman was told that her money would be invested in foreign currency.  That is simply not true.  She was told that it would be invested outside the country, but she specifically testified that nobody talked to her about investing in foreign

51

currency. Thus, there was insufficient evidence of any sale or offer to sell this or any other commodity to support Montecastro's conviction on count 84.

C.      *Count 131:  James Kabellis on February 19, 2006.*

1.      *Additional factual and procedural background.*

Count 131 charged commodities fraud on or about February 19, 2006 with respect to victim James Kabellis.

On January 30, 2006, Kabellis invested $29,600.  On February 1, 2006, he invested another $50,000.  He was told that these investments involved "real estate," "the buying of distressed properties," and "the selling of those distressed properties at a higher price." Kabellis specifically testified that he was not asked to invest in foreign currency.

Kabellis also testified that, after making these investments, he attended a seminar at the Pechanga Resort.  A transcript of that seminar was admitted into evidence.  It took place on February 19, 2006.  Attendees were solicited to become core clients of Pacific. It was stated that "we" would buy diamonds for $4,000 and sell them for $7,000.  It was also stated that "we" would buy Iraqi dinars.  "We own diamonds.  We own currency." Kabellis got a "bad feeling" and did not invest.

2.      *Discussion.*

The evidence regarding the Pechanga seminar was sufficient to establish that there was an offer to sell a commodity, namely both diamonds and foreign currency.  (See part VI.C, *ante*.)  While Kabellis testified that he was not asked to invest in foreign currency, the transcript proved that this was a memory lapse on his part.

52

Montecastro argues that Kabellis did not "rely" on any offer or representation made during the seminar. This is irrelevant, however, because commodities fraud can be committed by an offer to sell as well as a completed sale. Actual reliance is not required. (See *Bowden v. Robinson* (1977) 67 Cal.App.3d 705, 714 [securities fraud].)

D.     *Counts 137, 141, and 145:  David Kim in August 2006*.

1.     *Additional factual and procedural background*.

Counts 137, 141, 145, and 149 each charged commodities fraud on or about August 2006 with respect to victim David Kim. An enhancement for taking over $50,000 was attached to Count 137.

On August 30, 2006, Kim invested $20,000.

On August 31, 2006, he invested $84,557.96.

On October 5, 2006, he invested $17,830.

On October 11, 2006, he invested $11,775.

On November 30, 2006, he invested $19,500.

On December 5, 2006, he invested another $19,500.

When asked if he understood what the money was to be invested in, Kim testified, "I did not. They did mention something about opening MRI centers, but it was all very vague."

At one point, Kim was told "there was a different type of investment that would be invested in Iraqi currency . . . ." Kim testified that he invested $20,000 in this foreign currency scheme.

53

2.    *Discussion.*

Because it is unclear exactly when Kim was asked to invest in foreign currency, the People argue that the evidence supports multiple counts of commodities fraud as to Kim.

Kim made it clear that he invested in foreign currency only once, and that the amount of that investment was $20,000.  He also testified that this investment was "different" and "separate" from his other investments.  Thus, the evidence supported only one count of commodities fraud.  As the jury found that the taking charged in Count 137 was in excess of $50,000, this should be one of the counts reversed.

E.    *Conclusion.*

We therefore conclude that Montecastro's convictions on Counts 13, 21, and 25 (as to Berman), 84 (as to Elsman), 137, 141, and 145 (as to Kim) must be reversed.  There is no effect on the aggregate sentence.  However, Montecastro is entitled to a reduction of his court operations assessment fees (Gov. Code, § 1465.8, subd. (a)) and court facilities assessment fees (Gov. Code, § 70373, subd. (a)), because these are calculated on a per-count basis.

## VIII

## THE SUFFICIENCY OF THE EVIDENCE AS TO VICTIM NOLDE

Montecastro contends that there is insufficient evidence to support his convictions on the counts relating to victim Derek Nolde (counts 223-242).

A.      *Additional Factual and Procedural Background.*

Montecastro told Kelly that one of the shell companies "had really high rates of return." She invested her own money, "and they did what they promised as far as timeliness and rates of return."

Montecastro and Duncan encouraged her to bring in other investors. Montecastro offered her a referral fee of ten percent. From time to time, they would call her with the details on a new investment that was available. Specifically, they would tell her how much money they were looking to raise (e.g., $300,000), the duration of the investment (e.g., 90 days), and the rate of return (e.g., 10 percent). She would then "relay[]" that information by email to people in her circle of friends who she thought might be interested. She ended up referring some 20 to 30 people.

One of the people whom Kelly solicited was Derek Nolde. Nolde worked for a lender that was making "a lot of loans" to clients of the partnership. This made him think about investing in the partnership himself.

Kelly did not recall specifically what she told Nolde. However, she "believed" that she told him about the returns she had experienced, then referred him to someone else. Ultimately, Nolde made four separate investments, totaling $70,900.

B.      *Discussion.*

Montecastro argues that there is insufficient evidence to support the counts relating to Nolde, for three reasons.

First, he argues that there is no evidence of the identity of the person who obtained Nolde's commitment to invest. However, this was unnecessary. As already discussed, Montecastro conspired to operate the partnership as a fraudulent enterprise. "'One who conspires with others to commit a felony is guilty as a principal. [Citation.] "'Each member of the conspiracy is liable for the acts of any of the others in carrying out the *common* purpose, i.e., all acts within the reasonable and probable consequences of the common unlawful design.' [Citations.]" [Citation.]' [Citation.]" (*People v. Maciel* (2013) 57 Cal.4th 482, 515.) As long as there is sufficient evidence that some representative of the partnership committed a crime that was a natural and probable consequence of the overall scheme, Montecastro could be found guilty of that crime.

Second, he argues that there was no evidence of what Nolde was told and thus insufficient evidence to support those counts that required a false representation. Kelly testified, however, that either Montecastro or Duncan would give her the details regarding a particular investment, including the rate of return. She would "relay[]" this information to her friends. She also told her friends about the high rate of return she was already receiving. Unbeknownst to her (or so she claimed), these representations regarding the rates of return were fraudulent because the returns themselves were fraudulent.

In addition, it must be remembered that securities fraud can be committed, not only by "[m]ak[ing] an untrue statement of material fact," but also by "omit[ting] to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading." (Corp. Code, § 25401, subd. (b).) Similarly,

theft by false pretenses can be committed by suppressing a fact that makes the other facts that are communicated likely to mislead. (*People v. Mace* (1925) 71 Cal.App. 10, 21.) Kelly supposedly did not know — and certainly did not tell investors — that their money would be used to provide returns to previous investors or to pay Montecastro's and Duncan's personal expenses.

Third, he argues that there was no evidence as to exactly what Nolde invested in and hence insufficient evidence to support those counts that required the offer or sale of a security. However, in the opinion of expert witness McDonald, *all* of the investments the partnership offered were securities.

The only way there might be room for doubt is if it was unclear whether Nolde invested in foreign currency, and thus in a commodity rather than a security. Kelly testified, however, that she heard some talk about Iraqi dinars, but she never invested in them, and she did not remember being asked to invest in them. It is fairly inferable that she never recommended them to any of her friends, including Nolde.

We therefore conclude that there was sufficient evidence to support Montecastro's convictions on the counts relating to Nolde.

IX

THE PROSECUTION'S FAILURE TO CALL NOLDE

Montecastro contends that his conviction on the counts involving victim Nolde violated his right to confront the witnesses against him because Nolde did not testify.

57

"Defendant misunderstands the nature of the basic constitutional right . . . .  This is a right to be confronted by witnesses who testify against him *at the trial. . . .* 'The right of the accused to be confronted with witnesses is the right to have the witnesses testify in his presence and the right of the accused to cross-examine them; it is not required that all witnesses or persons who may have knowledge of the crime be produced in court or called to testify.'"  (*People v. Mason* (1960) 183 Cal.App.2d 168, 173-174; accord, *People v. Smith* (1959) 174 Cal.App.2d 129, 133-134.)  With regard to a similar argument, the United States Supreme Court has said, "This contention we consider absolutely devoid of merit."  (*Cooper v. California* (1967) 386 U.S. 58, 62, fn. 2.)

If Montecastro wanted Nolde to testify, he could have exercised his constitutional right to compulsory process (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15) and subpoenaed him.  Having failed to do so, he cannot complain.

X

MONTECASTRO'S SENTENCE AS CRUEL AND UNUSUAL PUNISHMENT

Montecastro contends that his sentence of 81 years and 8 months constitutes cruel and unusual punishment.

Preliminarily, the People respond that Montecastro forfeited this contention by failing to raise it below.  We agree.  A claim of cruel and unusual punishment is "fact specific"; as a result, it is forfeited unless raised below.  (*People v. DeJesus* (1995) 38 Cal.App.4th 1, 27; accord, *People v. Kelley* (1997) 52 Cal.App.4th 568, 583; *People v. Ross* (1994) 28 Cal.App.4th 1151, 1157, fn. 8.)

58

Separately and alternatively, we also reject this contention on the merits.

First, Montecastro argues that his sentence is disproportionate to the sentences received by other, more culpable participants in the same Ponzi scheme. For example, Duncan pleaded guilty and was sentenced to 19 years 8 months in state court and a maximum of 5 years in federal court. McLeod pleaded guilty and was sentenced to six years. Kelly was placed on probation.

This is essentially a demand for intercase (not intracase) proportionality review. "'[I]ntracase proportionality is "an examination of whether defendant's death sentence is proportionate to his *individual* culpability, irrespective of the punishment imposed on others."'" [Citation.]" (*People v. Bryant* (2014) 60 Cal.4th 335, 384.) By contrast, "intercase proportionality" is "a comparison of the imposed sentence with sentences in other similar cases." (*People v. Watkins* (2012) 55 Cal.4th 999, 1034.)

"Defendant is entitled to *intracase* proportionality review. [Citation.]" (*People v. Horning* (2004) 34 Cal.4th 871, 913.) However, "[i]ntercase proportionality review is not required under either the state or federal Constitution. [Citations.]" (*People v. Lucas*, *supra*, 60 Cal.4th at p. 333.) "This principle applies equally whether the comparison involves sentences for other, similar crimes or sentences of codefendants." (*People v. Ramos* (1997) 15 Cal.4th 1133, 1182.) "[T]he possibility that other persons who committed similar crimes may have received lesser sentences does not establish disproportionate punishment. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 513.)

59

That is particularly true when the codefendant has pleaded guilty (*People v. Ochoa* (2001) 26 Cal.4th 398, 458), as Duncan, McLeod, and Kelly all did in this case.

Montecastro devotes considerable discussion to the law dealing with intracase proportionality review. However, he never quite comes out and argues that the sentence was disproportionate to his own individual culpability. Even after we reverse his convictions on seven counts (see part VII, *ante*), he stands convicted on 297 counts of crimes against 27 different victims. We cannot say that the sentence was so disproportionate to these offenses as to be cruel and unusual.

Second, Montecastro argues that the sentence "is the functional equivalent of a life term." The significance of this is not apparent. A juvenile offender cannot be sentenced to life without parole — or the functional equivalent of life without parole — other than for homicide. (*Graham v. Florida* (2010) 560 U.S. 48, 74; *People v. Caballero* (2012) 55 Cal.4th 262, 267-268.) For an adult offender, however, there is no such per se bar. (*People v. Ayon* (1996) 46 Cal.App.4th 385, 396-401, disapproved on other grounds in *People v. Deloza* (1998) 18 Cal.4th 585, 600, fn. 10.)

Third, Montecastro argues that his defense was a "disaster" because he represented himself. "Defendants who have elected self-representation may not thereafter seek reversal of their convictions on the ground that their own efforts were inadequate and amounted to a denial of effective assistance of counsel. [Citation.] . . . [D]efendant may not predicate error on his own actions." (*People v. Bloom* (1989) 48 Cal.3d 1194, 1226.)

We therefore conclude that Montecastro's sentence did not constitute cruel and unusual punishment.

XI

ERRORS IN THE CALCULATION OF DIRECT VICTIM RESTITUTION

Both defendants contend that, at sentencing, their counsel rendered ineffective assistance by failing to object to mistakes that the trial court made in calculating direct victim restitution.

A.     *Additional Factual and Procedural Background.*

Before sentencing, Montecastro retained counsel.  The trial court appointed counsel for Pedrino.

The prosecutor filed a brief regarding direct victim restitution.  It included, as Exhibit A, a list of 25 of the victims named in the counts on which defendants had been found guilty,[16] showing, as to each:  (1) the amount of loss, (2) the theft end date, (2) interest at 10 percent from the theft end date to the date of the restitution award, and (4) a total restitution amount.  The grand total amount of restitution as shown on Exhibit A was $6,041,800.18.

---

**16**     As mentioned, Montecastro was found guilty on counts involving 27 victims.  However, as discussed in part V, *ante*, victim Breen never actually invested and thus had no losses.  Pacific Wealth Management LLC was the victim of the one count of identity theft; there was no evidence that it had any losses.  Thus, there were only 25 victims with losses.

61

Counsel for Montecastro filed a sentencing memorandum, but it did not address restitution. Moreover, at the sentencing hearing, neither defendant's counsel addressed the amount of restitution.

Accordingly, the trial court ordered each defendant to pay a total of $6,041,800.18.

B.    *Discussion*.

"[I]n every case in which a victim has suffered economic loss as a result of the defendant's conduct, the court shall require that the defendant make restitution to the victim or victims in an amount established by court order, based on the amount of loss claimed by the victim or victims or any other showing to the court." (Pen. Code, § 1202.4, subd. (f).)

An objection to the amount of restitution must be raised in the trial court; if it is not, it is forfeited for purposes of appeal. (*People v. Anderson* (2010) 50 Cal.4th 19, 26, fn. 6.) Defendants therefore argue that their counsel rendered ineffective assistance by failing to raise the issue below.

"'To establish ineffective assistance of counsel, a defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms, and (2) counsel's deficient performance was prejudicial, i.e., there is a reasonable probability that, but for counsel's failings, the result would have been more favorable to the defendant.' [Citation.]" (*People v. Johnson* (2015) 60 Cal.4th 966, 979-980.) "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the

conviction must be affirmed unless there could be no satisfactory explanation.

[Citation.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569.)

Here, assuming defendants are correct on the merits, we cannot imagine any rational tactical reason for failing to raise their present arguments below. Accordingly, we must confront those arguments, if only to determine whether counsel's failure was both objectively unreasonable and prejudicial.

        1.    *Montecastro*.

          a.    *Victim David Berman*.

The information alleged crimes committed against Berman on the following dates:

1. June 20, 2006.

2. July 27, 2006.

3. July 31, 2006.

4. August 4, 2006.

5. September 26, 2006.

In addition, it alleged two crimes committed from June 20 through September 26, 2006 — grand theft and acting as an investment advisor without a license.

The evidence at trial showed that Berman had invested the following amounts on the following dates:

1. January 24, 2006: $120,000.

2. June 20, 2006: Approximately $100,000.

3. July 27, 2006: $54,525.

4. July 31, 2006:  $100,000.

5. August 4, 2006:  $16,319.

6. September 26, 2006:  $19,000.

7. December 4, 2006:  $10,000.

These amounts totaled $419,844.  Thus, Exhibit A indicated that Berman's total loss was $419,844.

Montecastro argues that he was not convicted of any offense that occurred on December 4, 2006; accordingly, the $10,000 loss on that date was improperly included in the total restitution to Berman.  (The same argument would also seem to apply to the $120,000 loss on January 24, 2006.)

We recognize that "restitution may only be awarded for crimes the defendant is charged with and convicted of, even if the evidence shows beyond a reasonable doubt and the trial court finds the defendant committed an uncharged crime."  (*People v. Jessee* (2013) 222 Cal.App.4th 501, 510; accord, *People v. Lai* (2006) 138 Cal.App.4th 1227, 1246-1249.)

Here, however, Montecastro was convicted of one count of grand theft from Berman.  Under the law as it stood when the crimes were committed, a series of takings over time from a single victim constituted only one count of theft, if they were "committed pursuant to one intention, one general impulse and one plan.  [Citations.]"  (*People v. Kronemyer* (1987) 189 Cal.App.3d 314, 363-364; see also *People v. Whitmer* (2014) 59 Cal.4th 733, 739-742 [disapproving *Kronemyer* and similar cases, but only

64

prospectively].)  Here, then, the grand theft conviction encompassed all of the takings from Berman that were shown by the evidence.

Admittedly, the information alleged that the grand theft took place "on or about" June 20 through September 26, 2006.  However, this did not preclude the jury from finding that it actually started as early as January 24, 2006 and continued until as late as December 4, 2006.  (Pen. Code, § 955; see, e.g., *People v. Mack* (1959) 169 Cal.App.2d 825, 829-830.)

We conclude that the trial court could properly order Montecastro to pay restitution to Berman based on the aggregate amount of the grand theft.

b.  *Victim Emily Cavanaugh.*

On April 22, 2005, Cavanaugh invested $10,000.  She got back her principal, plus a profit of $1,000 or $1,100.[17]

On February 23, 2006, she reinvested her original $10,000.  She never got it back.

On December 5, 2006, she invested another $12,000.  She never got that back, either.

Thus, Cavanaugh's total loss was $22,000.  Exhibit A, however, stated that it was $32,000 — evidently because it failed to take into account the fact that Cavanaugh got her original $10,000 back.

---

[17]     Defendants do not claim to be entitled to a credit against restitution for any such profits received by victims.

The People concede the error. Interest at 10 percent from December 5, 2006 through January 21, 2014 (2,604 days) would be $15,695.34,**18** for a total of $37,695.34.

As the trial court ordered $54,800 in restitution to Cavanaugh, this is a reduction of $17,104.66.

c. *Victim Todd Cunningham.*

Initially, Cunningham invested $1,000. He got back his principal, plus a profit of $800.

On July 13, 2005, he invested $7,500. He got back his principal, plus some profit, in an amount he did not recall.

On October 27, 2006, he invested $115,848.75. He never got it back.

Thus, Cunningham's total loss was $115,848.75. According to Exhibit A, however, it was $123,348.75 — again, evidently because it disregarded the return of the $7,500.

The People seem to think Montecastro is arguing that he deserved credit for payments that were made on Cunningham's mortgage. He is not. Rather, he is arguing that the trial court erred by including the $7,500, which Cunningham did admittedly get back. Clearly, he is correct.

---

**18** Exhibit A calculated interest based on a 360-day year. When using a calculator rather than pencil and paper, however, this is actually more difficult. Hence, we use a 365-day year.

66

Interest at 10 percent from October 27, 2006[19] through January 21, 2014 (2,643 days) would be $83,887.19, for a total of $199,735.94.

As the trial court ordered $215,483.41 in restitution to Cunningham, this is a reduction of $15,747.47.

### d. *Victim Barbara Kinley*.

On February 27, 2006, Kinley invested $25,000. On an unspecified date, she got back her principal, plus a 10 percent profit, for a total of $27,500.

On May 10, 2006, she invested $30,000. On August 15, 2006, she got back her principal, plus a profit, for a total of $36,684.

On September 28, 2006, she invested $70,000. She never got it back.

Thus, Kinley's total loss was $70,000. According to Exhibit A, however, it was $125,000, yet again because it disregarded the return of some of her principal.

The People concede the error. Interest at 10 percent from September 28, 2006[20] through January 21, 2014 (2,672 days) would be $51,243.84, for a total of $121,243.84.

As the trial court ordered $224,652.78 in restitution to Kinley, this is a reduction of $103,408.94.

---

[19]     Exhibit A showed an erroneous theft end date of August 2, 2006.

[20]     Exhibit A showed an erroneous theft end date of February 1, 2006.

e. *Other Potential Errors.*

Montecastro's appellate counsel notes that she "has not conducted a detailed analysis to determine the accuracy of the restitution award as to each victim."  She asks that, if we find any errors, we remand "for a new restitution hearing to correct the errors noted in this appeal *and any other errors which may exist but were not discovered by appellate counsel.*"  (Italics added.)

We decline to do so.  The errors that Montecastro has shown can be corrected by modifying the judgment.  Any other errors have been forfeited by defendants' failure to raise them in their briefs.

To summarize, Montecastro's total restitution must be reduced from $6,041,800.18 by $136,261.07, for a new total of $5,905,539.11.

2. *Pedrino.*

Pedrino was found guilty of offenses against just five of the 25 victims named in Exhibit A.  Nevertheless, the trial court ordered her to pay restitution to all 25 victims.

The People concede that this was error.  We accept their concession.  The correct restitution amounts for Pedrino are:

Emily Cavanaugh:  $37,695.34 (see part XI.B.1.b, *ante*)

James Coufal:  $176,715.83

Leonila and Ron Elsman:  $66,816.70

James L'Heureux:  $49,702.78

Jeffery Mars:  $47,302.33

Total:  $378,232.98.

XII

ORDER PROHIBITING DEFENDANTS FROM POSSESSING A FIREARM,

A DEADLY WEAPON, AND AMMUNITION

At sentencing, the trial court ordered that defendants were not to knowingly own, possess, or control any firearm, deadly weapon, or ammunition.

Defendants contend that this resulted in an unauthorized sentence.  The People respond that defendants forfeited the asserted error by failing to object.  However, "defendants may challenge an unauthorized sentence on appeal even if they failed to object below . . . ."  (*People v. Hester* (2000) 22 Cal.4th 290, 295.)

The People also note that under Penal Code section 29800, subdivision (a)(1), it is illegal for any person convicted of a felony to own, possess, or control a firearm. Moreover, under Penal Code section 30305, subdivision (a), it is illegal for any person convicted of a felony to own, possess, or control ammunition.

Arguably, the trial court could have given defendants an advisal of these prohibitions.  Its order, however, went beyond a mere advisal; it imposed additional disabilities on defendants, in three respects.  First, it made a violation of Penal Code section 29800 or 30305 punishable as a contempt.  Second, it did not incorporate established defenses to a charge of violating Penal Code section 29800 or 30305, such as temporary possession for disposal (*People v. Hurtado* (1996) 47 Cal.App.4th 805, 814) or

69

for self-defense (*People v. King* (1978) 22 Cal.3d 12, 23-25).  Third, we have not found any statute prohibiting a person convicted of a felony from owning, possession, or controlling a deadly weapon; certainly the People do not cite any.  Thus, the trial court's order was unauthorized, and defendants are entitled to relief from it.

XIII

ERRORS IN THE ABSTRACT OF JUDGMENT

Montecastro contends that his abstract of judgment is erroneous in several respects.

A.      *Count 113*.

According to the reporter's transcript, the trial court made the sentence on count 113 (securities fraud) concurrent.  According to both the minute order and the abstract, however, the sentence was consecutive.

The People concede the error.  However, we do not accept their concession.

As the trial court ran *all 70* of the other counts of securities fraud consecutively, clearly it intended to run this count consecutively, too.  This is additionally clear from the trial court's statement that the total sentence was 81 years 8 months, which is true only if this count was run consecutively.

To determine whether the word that actually came out of the trial court's mouth was "concurrent" or "consecutive," all we can do is examine the record.  We recognize that "a discrepancy between the judgment as orally pronounced and as entered in the minutes is *presumably* the result of clerical error."  (*People v. Mesa* (1975) 14 Cal.3d

70

466, 471, italics added.)  But this is not a "mechanical rule."  (*People v. Smith* (1983) 33 Cal.3d 596, 599.)  "'It may be said . . . as a general rule that when, as in this case, the record is in conflict it will be harmonized if possible; but where this is not possible that part of the record will prevail, which, because of its origin and nature or otherwise, is entitled to greater credence [citation].  Therefore whether the recitals in the clerk's minutes should prevail as against contrary statements in the reporter's transcript, must depend upon the circumstances of each particular case.'  [Citations.]"  (*Ibid.*)

Even assuming the trial court actually said the word "concurrent," it is clear that it intended to say "consecutive."  This would be merely a clerical error on its part, not a judicial error.  (See *People v. Hunt* (1977) 19 Cal.3d 888, 894-896.)  There is no room for an inference that it intended an act of leniency.  (Cf. *In re Candelario* (1970) 3 Cal.3d 702, 706.)  "It is well established that a sentence which is the result of clerical error (in the sense of inadvertence, though committed by the judge) may be corrected at any time, by the trial court or the reviewing court . . . .  [Citations.]"  (*People v. Menius* (1994) 25 Cal.App.4th 1290, 1294-1295 [Fourth Dist., Div. Two].)

Here, we have no doubt that either the court reporter mistranscribed or the trial court misspoke.  Either way, the minute order is correct, and hence the abstract is correct.

B.      *Counts 140 and 141*.

According to the reporter's transcript, the trial court imposed a consecutive one-year term on count 140 (securities fraud), but immediately afterward it also imposed a

stayed concurrent three-year term on that same count; it imposed no sentence at all on count 141 (commodities fraud).

According to both the minute order and the abstract of judgment, however, it imposed a consecutive one-year term on count 140 and a stayed concurrent three-year term on count 141. This would be consistent with the way it sentenced other instances of securities fraud and commodities fraud committed on the same date against the same victim.

Obviously, when the trial court imposed the stayed concurrent three-year term, it misspoke and said count 140 again when it should have said count 141.

Thus, with respect to count 140, the abstract is correct. With respect to count 141, the abstract was correct; however, we are reversing count 141 (see part VII.D, *ante*), and the superior court clerk will have to prepare an amended abstract.

C.      *Count 241*.

According to the reporter's transcript, the trial court imposed no sentence at all on count 241 (unlicensed broker-dealer). It imposed a consecutive one-year term on count 242 (securities fraud), but immediately after that it also imposed a stayed concurrent two-year term on that same count.

According to the minute order and the abstract of judgment, however, it imposed a stayed concurrent two-year sentence on count 241 and a consecutive one-year sentence on count 242. This would be consistent with the way it sentenced other instances of acting

72

as a broker-dealer without a license and securities fraud committed on the same date against the same victim.

For the reasons already stated in parts XIII.A and XIII.B, *ante*, we conclude that the abstract is correct.

## XIV

## DISPOSITION

The judgment is modified, as follows:  (1)  Montecastro's convictions on counts 13, 21, 25, 84, 137, 141, and 145 are reversed.  (2)  The court operations assessment fee (Gov. Code, § 1465.8, subd. (a)) to be paid by Montecastro ($40 per count) is reduced from $12,120 to $11,880.  (3)  The court facilities assessment fee (Gov. Code, § 70373, subd. (a)) to be paid by Montecastro ($30 per count) is reduced from $9,090 to $8,910.  (4)  The restitution to be paid by Montecastro is reduced to $5,905,539.11, as further specified in part XI.B.1, *ante*.  The restitution to be paid by Pedrino is reduced to $378,232.98, as further specified in part XI.B.2, *ante*.  (5)  The order that defendants not own or possess a firearm, a deadly weapon, or ammunition is stricken.

The judgment as thus modified is affirmed.  The clerk of the superior court is directed to prepare amended sentencing minute orders and amended abstracts of judgment

73

reflecting these modifications and to forward a certified copy of the amended abstract to the Department of Corrections and Rehabilitation.  (Pen. Code, §§ 1213, subd. (a), 1216.)

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RAMIREZ

P. J.

We concur:

HOLLENHORST

J.

CODRINGTON

J.

| Ct | P[1] | Victim | Date | Crime | Enhancement | Outcome[2] |
|----|------|--------|------|-------|-------------|------------|
| 1 | | David Berman | 6/20/06-9/26/06 | Grand theft | Taking > $150K | |
| 2 | | David Berman | 6/20/06-9/26/06 | Investment advisor | Taking > $150K | |
| 3 | | David Berman | 6/20/06-9/26/06 | Unqualified security | Taking > $50K | |
| 4 | | David Berman | 6/20/06 | Broker-dealer | Taking > $50K | |
| 5 | | David Berman | 6/20/06 | Securities fraud | Taking > $50K | |
| 6 | | David Berman | 7/27/06 | Unqualified security | Taking > $50K | |
| 7 | | David Berman | 7/27/06 | Broker-dealer | Taking > $50K | |
| 8 | | David Berman | 7/27/06 | Securities fraud | Taking > $50K | |
| 9 | | David Berman | 7/27/06 | Commodities fraud | Taking > $50K | |
| 10 | | David Berman | 7/27/06 | Unqualified security | Taking > $50K | |
| 11 | | David Berman | 7/27/06 | Broker-dealer | Taking > $50K | |
| 12 | | David Berman | 7/27/06 | Securities fraud | Taking > $50K | |
| 13 | | David Berman | 7/27/06 | Commodities fraud | Taking > $50K | |
| 14 | | David Berman | 7/31/06 | Unqualified security | Taking > $50K | |
| 15 | | David Berman | 7/31/06 | Broker-dealer | Taking > $50K | |
| 16 | | David Berman | 7/31/06 | Securities fraud | Taking > $50K | |
| 17 | | David Berman | 7/31/06 | Commodities fraud | Taking > $50K | |
| 18 | | David Berman | 8/4/06 | Unqualified security | | |
| 19 | | David Berman | 8/4/06 | Broker-dealer | | |
| 20 | | David Berman | 8/4/06 | Securities fraud | | |
| 21 | | David Berman | 8/4/06 | Commodities fraud | | |

---

[1]     All counts were charged against Montecastro.  An "X" in this column means that the count was also charged against Pedrino.

[2]     All outcomes were "guilty" unless otherwise indicated.

| Ct | P[1] | Victim | Date | Crime | Enhancement | Outcome[2] |
|----|------|--------|------|-------|-------------|-----------|
| 22 | | David Berman | 9/26/06 | Unqualified security | | |
| 23 | | David Berman | 9/26/06 | Broker-dealer | | |
| 24 | | David Berman | 9/26/06 | Securities fraud | | |
| 25 | | David Berman | 9/26/06 | Commodities fraud | | |
| 26 | | Cashmarae Boyd | 12/6/06 | Grand theft | | Dismissed |
| 27 | | Cashmarae Boyd | 12/6/06 | Investment advisor | | Dismissed |
| 28 | | Cashmarae Boyd | 12/6/06 | Unqualified security | | Dismissed |
| 29 | | Cashmarae Boyd | 12/6/06 | Broker-dealer | | Dismissed |
| 30 | | Cashmarae Boyd | 12/6/06 | Securities fraud | | Dismissed |
| 31 | | Cashmarae Boyd | 12/6/06 | Commodities fraud | | Dismissed |
| 32 | | Christopher Breen | 12/1/06-1/10/07 | Unqualified security | | |
| 33 | | Christopher Breen | 12/1/06-1/10/07 | Commodities fraud | | |
| 34 | X | Emily Cavanaugh | 4/22/05-12/5/06 | Grand theft | | |
| 35 | | Emily Cavanaugh | 4/22/05-12/5/06 | Investment advisor | | |
| 36 | X | Emily Cavanaugh | 4/22/05 | Unqualified security | | |
| 37 | X | Emily Cavanaugh | 4/22/05 | Broker-dealer | | |
| 38 | X | Emily Cavanaugh | 4/22/05 | Securities fraud | | |
| 39 | X | Emily Cavanaugh | 2/06 | Unqualified security | | |
| 40 | X | Emily Cavanaugh | 2/06 | Broker-dealer | | |
| 41 | X | Emily Cavanaugh | 2/06 | Securities fraud | | |
| 42 | X | Emily Cavanaugh | 12/5/06 | Unqualified security | | |
| 43 | X | Emily Cavanaugh | 12/5/06 | Broker-dealer | | |
| 44 | X | Emily Cavanaugh | 12/5/06 | Securities fraud | | |
| 45 | | Emily Cavanaugh | 12/5/06 | Commodities fraud | | |

[1]     All counts were charged against Montecastro.  An "X" in this column means that the count was also charged against Pedrino.

[2]     All outcomes were "guilty" unless otherwise indicated.

ATTACHMENT A

2

| Ct | P[1] | Victim | Date | Crime | Enhancement | Outcome[2] |
|---|---|---|---|---|---|---|
| 46 | | Ester Celestino | 4/25/06-8/2/06 | Grand theft | Taking > $150K | |
| 47 | | Ester Celestino | 4/25/06 | Investment advisor | Taking > $150K | |
| 48 | | Ester Celestino | 4/25/06 | Unqualified security | Taking > $50K | |
| 49 | | Ester Celestino | 4/25/06 | Broker-dealer | Taking > $50K | |
| 50 | | Ester Celestino | 4/25/06 | Securities fraud | Taking > $50K | |
| 51 | | Ester Celestino | 7/26/06 | Unqualified security | | |
| 52 | | Ester Celestino | 7/26/06 | Broker-dealer | | |
| 53 | | Ester Celestino | 7/26/06 | Securities fraud | | |
| 54 | | Ester Celestino | 7/26/06 | Commodities fraud | | |
| 55 | | Ester Celestino | 7/06 | Unqualified security | | |
| 56 | | Ester Celestino | 7/06 | Broker-dealer | | |
| 57 | | Ester Celestino | 7/06 | Securities fraud | | |
| 58 | | Ester Celestino | 7/06 | Commodities fraud | | |
| 59 | X | James Coufal | 9/25/06 | Grand theft | Taking > $50K | |
| 60 | X | James Coufal | 9/25/06 | Investment advisor | Taking > $50K | |
| 61 | X | James Coufal | 9/25/06 | Unqualified security | Taking > $50K | |
| 62 | X | James Coufal | 9/25/06 | Broker-dealer | Taking > $50K | |
| 63 | X | James Coufal | 9/25/06 | Securities fraud | Taking > $50K | |
| 64 | | Todd Cunningham | 5/1/05-10/25/06 | Grand theft | Taking > $50K | |
| 65 | | Todd Cunningham | 5/1/05-10/25/06 | Investment advisor | Taking > $50K | |
| 66 | | Todd Cunningham | 5/05 | Unqualified security | | |
| 67 | | Todd Cunningham | 5/05 | Broker-dealer | | |
| 68 | | Todd Cunningham | 5/05 | Securities fraud | | |
| 69 | | Todd Cunningham | 7/13/05 | Unqualified security | | |

[1]     All counts were charged against Montecastro.  An "X" in this column means that the count was also charged against Pedrino.

[2]     All outcomes were "guilty" unless otherwise indicated.

ATTACHMENT A

| Ct | P[1] | Victim | Date | Crime | Enhancement | Outcome[2] |
|---|---|---|---|---|---|---|
| 70 | | Todd Cunningham | 7/13/05 | Broker-dealer | | |
| 71 | | Todd Cunningham | 7/13/05 | Securities fraud | | |
| 72 | | Todd Cunningham | 10/25/06 | Unqualified security | Taking > $50K | |
| 73 | | Todd Cunningham | 10/25/06 | Broker-dealer | Taking > $50K | |
| 74 | | Todd Cunningham | 10/25/06 | Securities fraud | Taking > $50K | |
| 75 | | Todd Cunningham | 10/25/06 | Commodities fraud | Taking > $50K | |
| 76 | X | Leonila & Ron Elsman | 12/1/06-12/27/06 | Grand theft | | |
| 77 | | Leonila & Ron Elsman | 12/1/06-12/27/06 | Investment advisor | | |
| 78 | | Leonila & Ron Elsman | 12/1/06 | Unqualified security | | |
| 79 | X | Leonila & Ron Elsman | 12/1/06 | Broker-dealer | | |
| 80 | X | Leonila & Ron Elsman | 12/1/06 | Securities fraud | | |
| 81 | X | Leonila & Ron Elsman | 12/27/06 | Unqualified security | | |
| 82 | X | Leonila & Ron Elsman | 12/27/06 | Broker-dealer | | |
| 83 | X | Leonila & Ron Elsman | 12/27/06 | Securities fraud | | |
| 84 | | Leonila & Ron Elsman | 12/27/06 | Commodities fraud | | |
| 85 | | Brian Hendley | 1/27/06-10/31/06 | Grand theft | | |
| 86 | | Brian Hendley | 1/27/06-10/31/06 | Investment advisor | | |
| 87 | | Brian Hendley | 1/27/06 | Unqualified security | | |
| 88 | | Brian Hendley | 1/27/06 | Broker-dealer | | |
| 89 | | Brian Hendley | 1/27/06 | Securities fraud | | |
| 90 | | Brian Hendley | 10/31/06 | Unqualified security | | |
| 91 | | Brian Hendley | 10/31/06 | Broker-dealer | | |
| 92 | | Brian Hendley | 10/31/06 | Securities fraud | | |
| 93 | | Christine Hynum | 5/06-10/06 | Grand theft | Taking > $150K | |

[1]     All counts were charged against Montecastro.  An "X" in this column means that the count was also charged against Pedrino.

[2]     All outcomes were "guilty" unless otherwise indicated.

ATTACHMENT A
4

| Ct | P[1] | Victim | Date | Crime | Enhancement | Outcome[2] |
|---|---|---|---|---|---|---|
| 94 | | Christine Hynum | 5/06-10/06 | Investment advisor | Taking > $150K | |
| 95 | | Christine Hynum | 5/30/06 | Unqualified security | Taking > $150K | |
| 96 | | Christine Hynum | 5/30/06 | Broker-dealer | Taking > $150K | |
| 97 | | Christine Hynum | 5/30/06 | Securities fraud | Taking > $150K | |
| 98 | | Christine Hynum | 5/30/06 | Commodities fraud | Taking > $150K | |
| 99 | | Christine Hynum | 5/31/06 | Unqualified security | Taking > $50K | |
| 100 | | Christine Hynum | 5/31/06 | Broker-dealer | Taking > $50K | |
| 101 | | Christine Hynum | 5/31/06 | Securities fraud | Taking > $50K | |
| 102 | | Christine Hynum | 5/31/06 | Commodities fraud | Taking > $50K | |
| 103 | | Christine Hynum | 6/06 | Unqualified security | | |
| 104 | | Christine Hynum | 6/06 | Broker-dealer | | |
| 105 | | Christine Hynum | 6/06 | Securities fraud | | |
| 106 | | Christine Hynum | 6/06 | Commodities fraud | | |
| 107 | | Christine Hynum | 7/26/06 | Unqualified security | | |
| 108 | | Christine Hynum | 7/26/06 | Broker-dealer | | |
| 109 | | Christine Hynum | 7/26/06 | Securities fraud | | |
| 110 | | Christine Hynum | 7/26/06 | Commodities fraud | | |
| 111 | | Christine Hynum | 10/13/06 | Unqualified security | | |
| 112 | | Christine Hynum | 10/13/06 | Broker-dealer | | |
| 113 | | Christine Hynum | 10/13/06 | Securities fraud | | |
| 114 | | Christine Hynum | 10/13/06 | Commodities fraud | | |
| 115 | | Carol Jennings & Casteel Logan | 6/26/06-10/3/06 | Grand theft | | |
| 116 | | Carol Jennings & Casteel Logan | 6/26/06 | Unqualified security | | |
| 117 | | Carol Jennings & Casteel Logan | 6/26/06 | Broker-dealer | | |

[1] All counts were charged against Montecastro. An "X" in this column means that the count was also charged against Pedrino.

[2] All outcomes were "guilty" unless otherwise indicated.

ATTACHMENT A

| Ct | P[1] | Victim | Date | Crime | Enhancement | Outcome[2] |
|---|---|---|---|---|---|---|
| 118 | | Carol Jennings & Casteel Logan | 6/26/06 | Securities fraud | | |
| 119 | | Carol Jennings & Casteel Logan | 10/3/06 | Unqualified security | | |
| 120 | | Carol Jennings & Casteel Logan | 10/3/06 | Broker-dealer | | |
| 121 | | Carol Jennings & Casteel Logan | 10/3/06 | Securities fraud | | |
| 122 | | James Kabellis | 1/30/06-2/1/06 | Grand theft | Taking > $50K | |
| 123 | | James Kabellis | 1/30/06 | Unqualified security | | |
| 124 | | James Kabellis | 1/30/06 | Broker-dealer | | |
| 125 | | James Kabellis | 1/30/06 | Securities fraud | | |
| 126 | | James Kabellis | 2/1/06 | Unqualified security | | |
| 127 | | James Kabellis | 2/1/06 | Broker-dealer | | |
| 128 | | James Kabellis | 2/1/06 | Securities fraud | | |
| 129 | | James Kabellis | 12/05-2/19/06 | Unqualified security | | |
| 130 | | James Kabellis | 12/05-2/19/06 | Securities fraud | | |
| 131 | | James Kabellis | 2/19/06 | Commodities fraud | | |
| 132 | | David Kim | 8/06 | Grand theft | Taking > $150K | |
| 133 | | David Kim | 8/06 | Investment advisor | Taking > $150K | |
| 134 | | David Kim | 8/06 | Unqualified security | Taking > $50K | |
| 135 | | David Kim | 8/06 | Broker-dealer | Taking > $50K | |
| 136 | | David Kim | 8/06 | Securities fraud | Taking > $50K | |
| 137 | | David Kim | 8/06 | Commodities fraud | Taking > $50K | |
| 138 | | David Kim | 8/06 | Unqualified security | | |
| 139 | | David Kim | 8/06 | Broker-dealer | | |
| 140 | | David Kim | 8/06 | Securities fraud | | |
| 141 | | David Kim | 8/06 | Commodities fraud | | |

[1] All counts were charged against Montecastro. An "X" in this column means that the count was also charged against Pedrino.

[2] All outcomes were "guilty" unless otherwise indicated.

ATTACHMENT A

6

| Ct | P[1] | Victim | Date | Crime | Enhancement | Outcome[2] |
|---|---|---|---|---|---|---|
| 142 | | David Kim | 8/06 | Unqualified security | | |
| 143 | | David Kim | 8/06 | Broker-dealer | | |
| 144 | | David Kim | 8/06 | Securities fraud | | |
| 145 | | David Kim | 8/06 | Commodities fraud | | |
| 146 | | David Kim | 8/06 | Unqualified security | | |
| 147 | | David Kim | 8/06 | Broker-dealer | | |
| 148 | | David Kim | 8/06 | Securities fraud | | |
| 149 | | David Kim | 8/06 | Commodities fraud | | |
| 150 | | Barbara Kinley | 2/27/06-9/28/06 | Grand theft | Taking > $50K | |
| 151 | | Barbara Kinley | 2/27/06 | Unqualified security | | |
| 152 | | Barbara Kinley | 2/27/06 | Broker-dealer | | |
| 153 | | Barbara Kinley | 2/27/06 | Securities fraud | | |
| 154 | | Barbara Kinley | 5/10/06 | Unqualified security | | |
| 155 | | Barbara Kinley | 5/10/06 | Broker-dealer | | |
| 156 | | Barbara Kinley | 5/10/06 | Securities fraud | | |
| 157 | | Barbara Kinley | 9/28/06 | Unqualified security | Taking > $50K | |
| 158 | | Barbara Kinley | 9/28/06 | Broker-dealer | Taking > $50K | |
| 159 | | Barbara Kinley | 9/28/06 | Securities fraud | Taking > $50K | |
| 160 | | Beverly Lau | 7/8/06-12/1/06 | Grand theft | Taking > $150K | |
| 161 | | Beverly Lau | 7/8/06-12/1/06 | Investment advisor | Taking > $150K | |
| 162 | | Beverly Lau | 8/25/06 | Unqualified security | | |
| 163 | | Beverly Lau | 8/25/06 | Broker-dealer | | |
| 164 | | Beverly Lau | 8/25/06 | Securities fraud | | |
| 165 | | Beverly Lau | 8/25/06 | Commodities fraud | | |

[1]    All counts were charged against Montecastro.  An "X" in this column means that the count was also charged against Pedrino.

[2]    All outcomes were "guilty" unless otherwise indicated.

ATTACHMENT A

7

| Ct | P[1] | Victim | Date | Crime | Enhancement | Outcome[2] |
|---|---|---|---|---|---|---|
| 166 | | Beverly Lau | 8/31/06 | Unqualified security | Taking > $150K | |
| 167 | | Beverly Lau | 8/31/06 | Broker-dealer | Taking > $150K | |
| 168 | | Beverly Lau | 8/31/06 | Securities fraud | Taking > $150K | |
| 169 | | Beverly Lau | 8/31/06 | Commodities fraud | Taking > $150K | |
| 170 | | Beverly Lau | 10/10/06 | Unqualified security | | |
| 171 | | Beverly Lau | 10/10/06 | Broker-dealer | | |
| 172 | | Beverly Lau | 10/10/06 | Securities fraud | | |
| 173 | | Beverly Lau | 10/10/06 | Commodities fraud | | |
| 174 | | Beverly Lau | 12/1/06 | Unqualified security | | |
| 175 | | Beverly Lau | 12/1/06 | Broker-dealer | | |
| 176 | | Beverly Lau | 12/1/06 | Securities fraud | | |
| 177 | | Beverly Lau | 12/1/06 | Commodities fraud | | |
| 178 | | Stephanie Lau | 8/06-9/06 | Grand theft | | |
| 179 | | Stephanie Lau | 8/06-9/06 | Investment advisor | | |
| 180 | | Stephanie Lau | 8/06 | Unqualified security | | |
| 181 | | Stephanie Lau | 8/06 | Broker-dealer | | |
| 182 | | Stephanie Lau | 8/06 | Securities fraud | | |
| 183 | | Stephanie Lau | 8/06 | Commodities fraud | | |
| 184 | | Stephanie Lau | 9/5/06 | Unqualified security | | |
| 185 | | Stephanie Lau | 9/5/06 | Broker-dealer | | |
| 186 | | Stephanie Lau | 9/5/06 | Securities fraud | | |
| 187 | | Stephanie Lau | 9/5/06 | Commodities fraud | | |
| 188 | X | James L'Heureux | 8/7/06-8/25/06 | Grand theft | | |
| 189 | | James L'Heureux | 8/7/06-8/25/06 | Investment advisor | | |

[1]     All counts were charged against Montecastro.  An "X" in this column means that the count was also charged against Pedrino.

[2]     All outcomes were "guilty" unless otherwise indicated.

ATTACHMENT A

| Ct | P[1] | Victim | Date | Crime | Enhancement | Outcome[2] |
|---|---|---|---|---|---|---|
| 190 | X | James L'Heureux | 8/7/06 | Unqualified security | | |
| 191 | X | James L'Heureux | 8/7/06 | Broker-dealer | | |
| 192 | X | James L'Heureux | 8/7/06 | Securities fraud | | |
| 193 | | James L'Heureux | 8/7/06 | Commodities fraud | | |
| 194 | X | James L'Heureux | 8/15/06 | Unqualified security | | |
| 195 | X | James L'Heureux | 8/15/06 | Broker-dealer | | |
| 196 | X | James L'Heureux | 8/15/06 | Securities fraud | | |
| 197 | | James L'Heureux | 8/15/06 | Commodities fraud | | |
| 198 | X | James L'Heureux | 8/21/06 | Unqualified security | | |
| 199 | X | James L'Heureux | 8/21/06 | Broker-dealer | | |
| 200 | X | James L'Heureux | 8/21/06 | Securities fraud | | |
| 201 | | James L'Heureux | 8/21/06 | Commodities fraud | | |
| 202 | X | James L'Heureux | 8/23/06 | Unqualified security | | |
| 203 | X | James L'Heureux | 8/23/06 | Broker-dealer | | |
| 204 | X | James L'Heureux | 8/23/06 | Securities fraud | | |
| 205 | | James L'Heureux | 8/23/06 | Commodities fraud | | |
| 206 | X | James L'Heureux | 8/25/06 | Unqualified security | | |
| 207 | X | James L'Heureux | 8/25/06 | Broker-dealer | | |
| 208 | X | James L'Heureux | 8/25/06 | Securities fraud | | |
| 209 | | James L'Heureux | 8/25/06 | Commodities fraud | | |
| 210 | | Pacific Wealth Management LLC | 2006 | Identity theft | | |
| 211 | | Garens Loyd | 10/06 | Grand theft | | |
| 212 | | Garens Loyd | 10/06 | Investment advisor | | |
| 213 | | Garens Loyd | 10/06 | Unqualified security | | |

[1]     All counts were charged against Montecastro.  An "X" in this column means that the count was also charged against Pedrino.

[2]     All outcomes were "guilty" unless otherwise indicated.

ATTACHMENT A
9

| Ct | P[1] | Victim | Date | Crime | Enhancement | Outcome[2] |
|---|---|---|---|---|---|---|
| 214 | | Garens Loyd | 10/06 | Broker-dealer | | |
| 215 | | Garens Loyd | 10/06 | Securities fraud | | |
| 216 | | Garens Loyd | 10/06 | Commodities fraud | | |
| 217 | X | Jeffery Mars | 10/18/06 | Grand theft | | |
| 218 | | Jeffery Mars | 10/18/06 | Investment advisor | | |
| 219 | X | Jeffery Mars | 10/18/06 | Unqualified security | | |
| 220 | X | Jeffery Mars | 10/18/06 | Broker-dealer | | |
| 221 | X | Jeffery Mars | 10/18/06 | Securities fraud | | |
| 222 | | Jeffery Mars | 10/18/06 | Commodities fraud | | |
| 223 | | Derek Nolde | 1/19/06-11/30/06 | Grand theft | Taking > $50K | |
| 224 | | Derek Nolde | 1/19/06-11/30/06 | Investment advisor | Taking > $50K | |
| 225 | | Derek Nolde | 1/06-2/06 | Unqualified security | | |
| 226 | | Derek Nolde | 1/06-2/06 | Broker-dealer | | |
| 227 | | Derek Nolde | 1/06-2/06 | Securities fraud | | |
| 228 | | Derek Nolde | 2/06 | Unqualified security | | |
| 229 | | Derek Nolde | 2/06 | Broker-dealer | | |
| 230 | | Derek Nolde | 2/06 | Securities fraud | | |
| 231 | | Derek Nolde | 2006 | Unqualified security | | |
| 232 | | Derek Nolde | 2006 | Broker-dealer | | |
| 233 | | Derek Nolde | 2006 | Securities fraud | | |
| 234 | | Derek Nolde | 2006 | Unqualified security | | |
| 235 | | Derek Nolde | 2006 | Broker-dealer | | |
| 236 | | Derek Nolde | 2006 | Securities fraud | | |
| 237 | | Derek Nolde | 2006 | Unqualified security | | |

[1]     All counts were charged against Montecastro.  An "X" in this column means that the count was also charged against Pedrino.

[2]     All outcomes were "guilty" unless otherwise indicated.

ATTACHMENT A

| Ct | P[1] | Victim | Date | Crime | Enhancement | Outcome[2] |
|---|---|---|---|---|---|---|
| 238 | | Derek Nolde | 2006 | Broker-dealer | | |
| 239 | | Derek Nolde | 2006 | Securities fraud | | |
| 240 | | Derek Nolde | 2006 | Unqualified security | | |
| 241 | | Derek Nolde | 2006 | Broker-dealer | | |
| 242 | | Derek Nolde | 2006 | Securities fraud | | |
| 243 | | Jason Park | 11/30/06 | Grand theft | | Not guilty |
| 244 | | Jason Park | 11/30/06 | Investment advisor | | Not guilty |
| 245 | | Jason Park | 11/30/06 | Unqualified security | | Not guilty |
| 246 | | Jason Park | 11/30/06 | Broker-dealer | | Not guilty |
| 247 | | Jason Park | 11/30/06 | Securities fraud | | Not guilty |
| 248 | | Jason Park | 11/30/06 | Commodities fraud | | Not guilty |
| 249 | | Kathleen & James Peacock | 12/06 | Grand theft | | |
| 250 | | Kathleen & James Peacock | 12/06 | Investment advisor | | |
| 251 | | Kathleen & James Peacock | 3/06-6/06 | Unqualified security | | |
| 252 | | Kathleen & James Peacock | 3/06-6/06 | Securities fraud | | |
| 253 | | Kathleen & James Peacock | 12/06 | Unqualified security | | |
| 254 | | Kathleen & James Peacock | 12/06 | Broker-dealer | | |
| 255 | | Kathleen & James Peacock | 12/06 | Securities fraud | | |
| 256 | | Kathleen & James Peacock | 12/06 | Commodities fraud | | |
| 257 | | Jose & Mercy Rocha | 2006 | Elder abuse | Taking > $150K | |
| 258 | | Jose & Mercy Rocha | 2006 | Investment advisor | Taking > $150K | |
| 259 | | Jose & Mercy Rocha | 2006 | Unqualified security | Taking > $150K | |
| 260 | | Jose & Mercy Rocha | 2006 | Broker-dealer | Taking > $150K | |
| 261 | | Jose & Mercy Rocha | 2006 | Securities fraud | Taking > $150K | |

[1] All counts were charged against Montecastro. An "X" in this column means that the count was also charged against Pedrino.

[2] All outcomes were "guilty" unless otherwise indicated.

ATTACHMENT A

11

| Ct | P[1] | Victim | Date | Crime | Enhancement | Outcome[2] |
|---|---|---|---|---|---|---|
| 262 | | Jose & Mercy Rocha | 2006 | Commodities fraud | Taking > $150K | |
| 263 | | Jose & Mercy Rocha | 2006 | Unqualified security | | |
| 264 | | Jose & Mercy Rocha | 2006 | Broker-dealer | | |
| 265 | | Jose & Mercy Rocha | 2006 | Securities fraud | | |
| 266 | | Jose & Mercy Rocha | 2006 | Commodities fraud | | |
| 267 | | Eduardo Stecher | 10/06-12/06 | Grand theft | | |
| 268 | | Eduardo Stecher | 10/06-12/06 | Investment advisor | | |
| 269 | | Eduardo Stecher | 10/06-12/06 | Unqualified security | | |
| 270 | | Eduardo Stecher | 10/06-12/06 | Broker-dealer | | |
| 271 | | Eduardo Stecher | 10/06-12/06 | Securities fraud | | |
| 272 | | Eduardo Stecher | 10/06-12/06 | Commodities fraud | | Not guilty |
| 273 | | Susan Taylor & Michael Riddell | 6/16/06-7/5/06 | Grand theft | Taking > $150K | |
| 274 | | Susan Taylor & Michael Riddell | 6/16/06 | Unqualified security | Taking > $150K | |
| 275 | | Susan Taylor & Michael Riddell | 6/16/06 | Broker-dealer | Taking > $150K | |
| 276 | | Susan Taylor & Michael Riddell | 6/16/06 | Securities fraud | Taking > $150K | |
| 277 | | Susan Taylor & Michael Riddell | 7/5/06 | Grand theft | Taking > $50K | |
| 278 | | Susan Taylor & Michael Riddell | 7/5/06 | Unqualified security | Taking > $50K | |
| 279 | | Susan Taylor & Michael Riddell | 7/5/06 | Broker-dealer | Taking > $50K | |
| 280 | | Susan Taylor & Michael Riddell | 7/5/06 | Securities fraud | Taking > $50K | |
| 281 | | Michael Tecson | 6/06-1/07 | Grand theft | | |
| 282 | | Michael Tecson | 6/06-1/07 | Investment advisor | | |
| 283 | | Michael Tecson | 6/22/06 | Unqualified security | Taking > $50K | |
| 284 | | Michael Tecson | 6/22/06 | Broker-dealer | Taking > $50K | |
| 285 | | Michael Tecson | 6/22/06 | Securities fraud | Taking > $50K | |

[1]    All counts were charged against Montecastro.  An "X" in this column means that the count was also charged against Pedrino.

[2]    All outcomes were "guilty" unless otherwise indicated.

ATTACHMENT A

12

| Ct | P[1] | Victim | Date | Crime | Enhancement | Outcome[2] |
|---|---|---|---|---|---|---|
| 286 | | Michael Tecson | 12/6/06 | Unqualified security | | |
| 287 | | Michael Tecson | 12/6/06 | Broker-dealer | | |
| 288 | | Michael Tecson | 12/6/06 | Securities fraud | | |
| 289 | | Michael Tecson | 12/6/06 | Commodities fraud | | |
| 290 | | Brian Voytovich | 6/19/06-11/29/06 | Grand theft | Taking > $50K | |
| 291 | | Brian Voytovich | 6/19/06-11/29/06 | Investment advisor | Taking > $50K | |
| 292 | | Brian Voytovich | 6/19/06 | Unqualified security | Taking > $50K | |
| 293 | | Brian Voytovich | 6/19/06 | Broker-dealer | Taking > $50K | |
| 294 | | Brian Voytovich | 6/19/06 | Securities fraud | Taking > $50K | |
| 295 | | Brian Voytovich | 6/19/06 | Commodities fraud | Taking > $50K | |
| 296 | | Brian Voytovich | 11/29/06 | Unqualified security | | |
| 297 | | Brian Voytovich | 11/29/06 | Broker-dealer | | |
| 298 | | Brian Voytovich | 11/29/06 | Securities fraud | | |
| 299 | | Brian Voytovich | 11/29/06 | Commodities fraud | | |
| 300 | | Deborah & Herman Weber | 6/29/06-12/4/06 | Grand theft | Taking > $150K | |
| 301 | | Deborah & Herman Weber | 6/29/06-12/4/06 | Investment advisor | Taking > $150K | |
| 302 | | Deborah & Herman Weber | 6/29/06 | Unqualified security | Taking > $150K | |
| 303 | | Deborah & Herman Weber | 6/29/06 | Broker-dealer | Taking > $150K | |
| 304 | | Deborah & Herman Weber | 6/29/06 | Securities fraud | Taking > $150K | |
| 305 | | Deborah & Herman Weber | 6/29/06 | Commodities fraud | Taking > $150K | |
| 306 | | Deborah & Herman Weber | 7/25/06 | Unqualified security | | |
| 307 | | Deborah & Herman Weber | 7/25/06 | Broker-dealer | | |
| 308 | | Deborah & Herman Weber | 7/25/06 | Securities fraud | | |
| 309 | | Deborah & Herman Weber | 7/25/06 | Commodities fraud | | |

[1]    All counts were charged against Montecastro.  An "X" in this column means that the count was also charged against Pedrino.

[2]    All outcomes were "guilty" unless otherwise indicated.

ATTACHMENT A

| Ct | P[1] | Victim | Date | Crime | Enhancement | Outcome[2] |
|---|---|---|---|---|---|---|
| 310 | | Deborah & Herman Weber | 8/21/06 | Unqualified security | | |
| 311 | | Deborah & Herman Weber | 8/21/06 | Broker-dealer | | |
| 312 | | Deborah & Herman Weber | 8/21/06 | Securities fraud | | |
| 313 | | Deborah & Herman Weber | 8/21/06 | Commodities fraud | | |
| 314 | | Deborah & Herman Weber | 12/4/06 | Unqualified security | | |
| 315 | | Deborah & Herman Weber | 12/4/06 | Broker-dealer | | |
| 316 | | Deborah & Herman Weber | 12/4/06 | Securities fraud | | |
| 317 | | Deborah & Herman Weber | 12/4/06 | Commodities fraud | | |
| Enh | X | | | | Aggregate taking > $100K | |
| Enh | | | | | Aggregate taking > $500K | |

[1]     All counts were charged against Montecastro.  An "X" in this column means that the count was also charged against Pedrino.

[2]     All outcomes were "guilty" unless otherwise indicated.

ATTACHMENT A

14